**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| M3 USA CORPORATION,<br>  501 Office Center Drive Suite 410<br>  Fort Washington, PA 19034 | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| KARIE HART,<br>  83 Flatt Road<br>  Shamong, New Jersey 08088 | ) ) ) ) ) | |
| ATLAS PRIMARY, INC.<br>  756 West Peachtree St. NW, Fourth Floor<br>  Atlanta, Georgia 30308 | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiff M3 USA Corporation ("M3"), by and through its counsel, brings this action against Karie Hart ("Hart") and Atlas Primary, Inc. ("Atlas") (collectively "Defendants"), and hereby alleges as follows:

**NATURE OF ACTION**

1.     This is an action arising from Hart's former employment with M3, including the breach of her restrictive covenants and duty of loyalty to M3 and subsequent post-employment conduct, including misappropriation of M3's trade secrets and confidential information for the benefit of Atlas.

## PARTIES

2.      Plaintiff M3 USA Corporation is a corporation organized under the laws of the State of Delaware and maintains its principal place of business located in Commonwealth of Pennsylvania.

3.      Upon information and belief, Defendant Hart is a citizen and domiciliary of New Jersey.

4.      Upon information and belief, Defendant Atlas is a corporation organized under the laws of the Delaware and headquartered in the State of Georgia.

## JURISDICTION AND VENUE

5.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, as this case arises under federal law and evokes a question of federal law.

6.      Count I of the Complaint alleges violations of the Defend Trade Secrets Act, 18 U.S.C.A. § 1836.

7.      The Court has supplemental jurisdiction over all remaining counts under 28 U.S.C. § 1367, as the remaining claims in the remaining counts form part of the same case or controversy.

8.      Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391, because the events that give rise to the claims herein substantially involve Hart's former employment with M3, which is headquartered in Fort Washington, Pennsylvania.

## FACTS

9.      M3 provides market research recruitment, data collection, and support services primarily in the healthcare space in the US, Europe, and Asia, primarily doing business as M3 Global Research.

2

10.     M3 works with health care professionals and invites health care professionals to participate in surveys and interviews.  M3 provides research to market research agencies and pharmaceutical companies.

11.     Among other services, M3 provides qualitative and quantitative research, provides recruitment services for healthcare providers, patients, caregivers, and consumers, as well as data collection, face-to-face, telephone, and online surveys.  M3 creates and maintains relationships and panels of patients, caregivers, and general consumers.

12.     Market research in the healthcare space is a highly competitive industry, with high employee turnover between companies competing over the same clients and customers.

13.     Companies reach out to various market research companies requesting bids and quotes for specific projects.

14.     M3 has confidential and proprietary formulas for calculating the potential costs of projects, pricing, and bid amounts to compete for projects.

15.     This information is not public information and the only people with access to this type of information must sign non-confidentiality or non-disclosure agreements.  This information is housed on password protected networks, servers, and equipment.

16.     There is substantial economic value to competitors in gaining information regarding competitors' bid amounts and other data to undercut competitor bids and win projects.

17.     M3 hired Hart as an Inside Sales Manager on May 29, 2009, to start June 1, 2020.

18.     On June 1, 2009, as a condition of her employment, Hart signed a Proprietary Information and Inventions Agreement ("Hart PIIA") with confidentiality provisions in which she agreed that she would "hold in confidence and not disclose or, except within the scope of [her] employment with Company, use any Proprietary Information."  Hart PIIA ¶ 2.

3

19.     As part of her 2010 Commission Plan, Hart executed an agreement with M3 containing a Confidentiality and Non-Solicitation Agreement ("CNSA").  In exchange for the commissions from her sales and access to valuable information related to the business that provides M3 a competitive advantage, which is not generally known or easily learned by persons outside the company, she agreed that at all times during her employment with M3 and after her employment, that she would "hold all of the Company's Trade Secrets and Proprietary Information in a fiduciary capacity for the benefit of the Company and to safeguard all such Trade Secrets and Proprietary Information.  CNSA ¶ 2.

20.     Hart agreed not to directly or indirectly disclose or use any such Trade Secret or Proprietary information to any third person or entity outside of the company," except in the good faith performance of her duties.  CNSA ¶ 2.

21.     Hart also agreed that during the period of her employment and the one year period following the termination of her employment for any reason, that she would not "contact, call upon, encourage or solicit, on behalf of a Competitive Business . . . any existing or prospective client or customer of the Company, who [she] serviced, or otherwise developed a relationship with, as a result of [her] employment with the Company, nor will [she] attempt to divert or take away from the Company the business or any such client or customer . . . ."  CNSA ¶ 3.

22.     The CNSA defines competitive business as "any enterprise engaged in developing, selling or proving (via the internet or other means) health or wellness information, decision support tools or services or applications and/or communications services, director or indirectly to consumers, health or benefit plan members, employees or healthcare professionals, including but not limited to products or services that provide information on diseases, conditions or treatments, store health care information, assess personal health status . . ." or "any enterprise engaged in any

other type of business in which the Company is also engaged, or plans to be engaged, so long as [she] was directly involved in such business or planned business on behalf of the company." CNSA ¶ 3.

23.     Hart acknowledged that the restrictions were reasonably necessary to protect M3's legitimate interests, and that violation of the restrictions would result in immediate and irreparable injury to M3.  CNSA ¶ 4.  Hart further acknowledged that M3 would be entitled to immediate relief, including a decree for specific performance, a temporary and permanent injunction, equitable accounting of earnings, profits and other benefits arising from the violations.  CNSA ¶ 4.

24.     The CNSA included a tolling provision that the Restricted Period shall be extended for a period of time equal to the period of time during which Hart breached the agreement. CNSA ¶ 4.

25.     The CNSA also included a blue pencil provision that in the event that the confidentiality or non-solicitation clauses shall be deemed unenforceable as written, the court has the authority to rewrite the restrictions to achieve its intent.

26.     Furthermore, the CNSA required Hart to inform each new employer, prior to accepting employment, of the existence of the CNSA and to provide the employer with a copy of the CNSA (and any other restrictive covenant to which she was bound).  CNSA ¶ 8.

27.     During her employment with M3, M3 provided Hart with access to confidential and proprietary information not available to the public and developed as a result of significant time and expense of M3, such as customer lists, products, services, pricing, costs, profits, sales, marketing and business plans, budgets, forecasts, non-public financial information, client requirements, internally developed methods of customer solicitation, information assembled relating to existing and prospective customers, arrangements with customers and suppliers, market

5

or market extensions, trade secrets, processes, know-how, methods of operation, software, and documentation.

28.     Around March 2014, M3 promoted Hart to Senior Account Manager and around December 2014, M3 promoted Hart to a Vice President of Sales position.

29.     As Vice President of Sales, Hart's primarily oversaw two main accounts—the BluePrint Research Group ("BluePrint") account and the Adelphi Research ("Adelphi") account, with some other smaller accounts as well. The BluePrint account was almost exclusively overseen by Hart and Hart was the primary contact for BluePrint on almost all facets of the projects.

30.     On December 19, 2016, M3 signed a Market Research Master Services Agreement ("MSA") with BluePrint that M3 would provide various healthcare market research services to BluePrint. This MSA has been amended various times between December 19, 2016, and January 1, 2019.

31.     M3 had a steady and increasing revenue stream with consistent sales from the BluePrint account from 2016 to 2019.

32.     On January 1, 2020, Indrani DasGupta ("DasGupta"), M3's former Chief Revenue Officer, resigned her employment with M3 to become the Chief Executive Officer of Atlas Primary, Inc.

33.     According to its website, Atlas is a healthcare primary research company that provides clients with "expert healthcare data collection solutions." It provides quantitative, qualitative, custom solutions, and additional services such as survey programming, data and reporting, and add-ons in the United States. Atlas has and continues to compete directly with M3, providing the same or similar services to M3's clients.

34.     Within months of starting Atlas, DasGupta began poaching M3's current employees and clients.

35.     As a former executive of M3, DasGupta was aware of the confidentiality and restrictive covenant agreements that the company required its employees to sign.

36.     On May 29, 2020, Savanah Haunert, a former M3 Project Manager III, submitted her resignation and was immediately hired by Atlas as its Director of Market Research Operations in violation of Haunert's PIIA with M3.  Haunert supported Hart's work on the BluePrint account.

37.     Additionally, upon information and belief, between February and June 2020, DasGupta and Hart discussed Hart leaving M3 to join Atlas as well, and Hart's plan to take the BluePrint account with her to Atlas.

38.     Prior to her resignation from M3 on July 30, 2020, Hart admitted to having already sold a substantial amount of business for Atlas.

39.     M3 began to experience a loss of BluePrint business prior to Hart's resignation. M3's 2020 sales to BluePrint dropped significantly from their consistent 2017 to 2019 numbers. Starting in April 2020, there was a substantial reduction in sales every month from April to July 2020, particularly when compared to April to July of 2019.  Significantly, one of the most substantial year-over-year reductions was in July 2020 – the month that Hart resigned her employment with M3.  From 2019 to 2020 to October 23, 2020, M3's "win rate" for BluePrint projects dropped by 7.69 percent and bid counts for projects were down by 42 bids, year-over-year.

40.     Additionally, bid counts from BluePrint began dropping in June 2020 and stayed well below 2019 numbers though July 2020 and beyond.  Not only did the number of BluePrint bids drop in 2020, but the average quote count on BluePrint bids also dropped.

41.     At least some of this loss of business to BluePrint in the months prior to Hart's resignation was the result of BluePrint shifting its business from M3 to Atlas.  For example, in previous years M3 would provide BluePrint with a global bid for a particular pharmaceutical company, which included samples in core markets, such as the US, EU5, Japan, and China.  On the other hand, in 2020, M3 was only asked to bid on a significantly more limited research sample in Turkey, Korea, and Brazil.  M3 was then approached by Atlas to support the US portion of the sample, indicating that Atlas had won a substantial portion of that particular project.

42.     On July 30, 2020, Hart resigned her employment with M3 to join Atlas.  Hart's last day with M3 was July 31, 2020.

43.     Upon information and belief, on or around August 1, 2020, Atlas hired Hart as a Senior Vice President.

44.     Prior to leaving M3, and in the days after, Hart misappropriated M3's confidential and proprietary information and trade secrets regarding BluePrint and potentially other clients upon her departure.

45.     Hart's Market Research system activity logs in the Market Research system showed unusual and increased access to "partners," "client," and "clients" section of the site from February to May 2020, from her username in the months immediately following DasGupta's departure from M3.  This activity was significantly increased from her previous access to these areas of the site and would have allowed her to obtain and transmit confidential and proprietary client information, including trade secrets, to herself or Atlas.

46.     Hart also had unusual activity in the Market Research database on July 28 and July 29, 2020, the two days prior to her resignation, during which she was searching pricing

documents.  This type of activity was not typical of Hart's prior activity and would not have been required in the regular course of her job duties at that time.

47.     Hart also accessed various files and folders on her laptop on July 31, 2020 between 9:27 AM and 17:28, including BluePrint and Adelphi project folders.  Hart also accessed a folder on the internal hard drive of the laptop called "BluePrint."

48.     During that time, a USB DISK 2.0 Device with a serial number 070855D448907052 was plugged into Hart's laptop on July 31, 2020 at 17:25.  This USB device was never provided to M3 upon the separation of Hart's employment.

49.     Hart again accessed BluePrint files on August 3, 2020, between 16:09 and 16:14, *after her employment with M3 had ended*.

50.     Hart created a subfolder called "BluePrint – Copy" at 16:14 on August 3, 2020, within the Documents\BluePrint folder.

51.     At the same time, Hart's internet browser history shows she accessed her personal Yahoo email address and composed an email within the same timeframe (August 3, 2020, at 16:10).

52.     Upon information and belief, Hart, acting as an agent of Atlas, abused her access to M3's Market Research system and other client-related files on her company laptop to gain trade secret information such as client pricing, project costs, bid information, and panel information to gain a competitive advantage for Atlas in violation of the M3's policies, employee handbook, her PIIA, and her CNSA.

53.     Upon information and belief, this information was used to undercut M3's bids and divert business from M3 to Atlas.

54.     Hart is continuing to work on the BluePrint account for Atlas.

55.     As a result, M3 continues to lose BluePrint sales, revenue, and bids to Atlas, and Atlas is continuing to take projects from M3.

56.     On September 1, 2020, immediately after learning that Hart had been intentionally diverting M3 business to Atlas, M3 sent Hart and DasGupta a cease and desist letter demanding that Hart and Atlas cease the breach of Hart's restrictive covenants and demanding the return of M3's confidential information and trade secrets.

57.     The parties attempted to resolve these issues informally but in October 2020, settlement discussions broke down and Hart and Atlas refused to cease their unlawful activities.

## CLAIMS FOR RELIEF

### Count One - Violation of Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836 *et seq*. (Hart and Atlas)

58.     M3 incorporates by reference paragraphs 1 through 57 above, as if fully set forth herein.

59.     M3 owns trade secrets including confidential pricing, bid, and client information that it uses to compete for market research projects, which meet the definition of a trade secret under 18 U.S.C. § 1839(3).

60.     M3's pricing, bid, and client information is information that derives actual and potential economic value from the fact that this information is not generally known to the public and is not readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

61.     M3 took reasonable measures to protect such information and keep it secret, including, but not limited to, password protecting access to the Market Research system, requiring all employees to return company property upon termination, and requiring anyone with access to client and sales information to sign PIIAs, confidentiality, or non-disclosure agreements.

62.     Hart misappropriated M3's trade secrets by acquiring M3's client information by improper means, including by misusing her M3 Market Research system login credentials and access to M3's client files to copy and send client information, pricing information, project costs, bid information, and panel information to herself without M3's consent or permission.

63.     Hart, as an agent of Atlas, and acting substantially within the scope of her employment and in service of Atlas, further misappropriated M3's trade secrets by using and/or disclosing M3's client information without its consent to compete with M3 for projects for Atlas' benefit.

64.     Hart, as an agent of Atlas, and acting substantially within the scope of her employment and in service of Atlas, used and/or disclosed M3's client information with knowledge that she acquired the information under circumstances giving rise to a duty to maintain the secrecy of the information under her duty of loyalty to M3 and the contractual provisions of Hart's PIIA and the CNSA.

65.     Defendants' misappropriation of M3's trade secrets rises to the level of willful and malicious, without justification or excuse, and Hart and Atlas knew that Hart's misconduct would harm and interfere with M3's economic and competitive advantage.

66.     Defendants have materially harmed and damaged M3 by their misappropriation of M3's trade secrets.

67.     As a result of such actions by Defendants, M3 is entitled to injunctive relief, reasonable royalty for the unauthorized use of its trade secret, exemplary damages, reasonable attorneys' fees, and costs.

**Count Two - Misappropriation in Violation of Penn. Uniform Trade Secret Act (PUTSA),**
**12 Pa.C.S.A. § 5301 et seq. (Hart and Atlas)**

68.     M3 incorporates by reference paragraphs 1 through 67 above, as if fully set forth herein.

69.     M3 owns trade secrets including confidential pricing, bid, and client information that it uses to compete for market research projects, which meet the definition of a trade secret under 12 Pa.C.S.A. § 5302.

70.     M3's pricing, bid, and client information is information that derives actual and potential economic value from the fact that this information is not generally known to the public and is not readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

71.     M3 took reasonable measures to protect such information and keep it secret, including, but not limited to, password protecting access to the Market Research system, requiring all employees to return company property upon termination, and requiring anyone with access to client and sales information to sign PIIAs, confidentiality, or non-disclosure agreements.

72.     Hart misappropriated M3's trade secrets by acquiring M3's client information, pricing information, project costs, bid information, and panel information by improper means, including by misusing her M3 Market Research system login credentials and access to M3's client files to copy and send client information to herself without M3's consent or permission.

73.     Hart, as an agent of Atlas, and acting substantially within the scope of her employment and in service of Atlas, further misappropriated M3's client information without its consent to compete with M3 for projects for Atlas' benefit.

74.     Hart, as an agent of Atlas, and acting substantially within the scope of her employment and in service of Atlas, used and/or disclosed M3's client information with

knowledge that she acquired the information under circumstances giving rise to a duty to maintain the secrecy of the information under her duty of loyalty to M3 and the contractual provisions of Hart's PIIA and the CNSA.

75.    Defendants' misappropriation of M3's trade secrets rises to the level of willful and malicious, without justification or excuse, and Hart and Atlas knew that Hart's misconduct would harm and interfere with M3's economic and competitive advantage.

76.    Defendants have materially harmed and damaged M3 by their misappropriation of M3's trade secrets.

77.    As a result of such actions by Defendants, M3 is entitled to injunctive relief, reasonable royalty for the unauthorized use of its trade secret, actual loss caused by the misappropriation, unjust enrichment caused by the misappropriation, exemplary damages, or alternatively a reasonable royalty for Defendants' unauthorized disclosure and/or use of M3 trade secrets, and reasonable attorneys' fees, and costs.

<u>**Count Three - Breach of Fiduciary Duty of Loyalty (Hart Only)**</u>

78.    M3 incorporates by reference paragraphs 1 through 77 above, as if fully set forth herein.

79.    As an employee of M3 with access to trade secrets and confidential and proprietary information, Hart owed a fiduciary duty of good faith and loyalty to M3 in the performance of her duties.

80.    Hart willfully and maliciously breached her fiduciary duty by misusing her access to the Market Research system and client information to misappropriate M3's confidential proprietary information and trade secrets with the intention to use them to compete against M3 without its authorization or consent.

81.     Hart also willfully and maliciously breached her fiduciary duty by diverting sales away from M3 to Atlas prior to her resignation from M3.

82.     As a direct and proximate result of Hart's breach of her fiduciary duty of loyalty, M3 suffered damages, including its competitive position, its economic expectancies, and damages in an amount to be determined at trial.

83.     Upon information and belief, Hart's breach of her fiduciary duties occurred with actual malice toward M3 or with recklessness or negligence to M3's rights, entitling M3 to punitive damages.

### Count Four – Breach Of Contract – Confidentiality and Non-Solicitation Agreement (Hart Only)

84.     M3 incorporates by reference paragraphs 1 through 83 above, as if fully set forth herein.

85.     The CNSA is a valid contract that is binding upon Hart and is supported by mutual consideration.

86.     M3 performed all of its material obligations under the CNSA.

87.     The covenant restricting solicitation and diverting away of M3's clients and customers for one year after the termination of Hart's employment (CNSA ¶ 3) was reasonable in scope to protect M3's legitimate business interests.

88.     The CNSA's provision that required Hart to "hold all of the Company's Trade Secrets and Proprietary Information in a fiduciary capacity for the benefit of the Company and to safeguard all such Trade Secrets and Proprietary Information" (CNSA ¶ 2) was reasonable to protect M3's legitimate interests.

89.     Hart breached, is breaching, and threatening to continue to breach the CNSA by:

14

     (a)     directly soliciting and diverting away M3's current clients within the restricted time period of the non-solicitation clause of the CNSA;

     (b)     misappropriating and misusing M3's confidential, proprietary, and trade secret information; and

     ©     misappropriating and misusing M3's confidential, proprietary, and trade secret information to compete with M3 during her employment with M3.

90.     Hart's breach of the NCSA triggered the tolling provisions of Section 4 of the NCSA, that the restricted period shall be extended for a period of time equal to the period of time during which Hart breached the agreement.  CNSA ¶ 4.

91.     As a direct and proximate result of the foregoing acts, M3 has suffered and continues to suffer harm to its competitive position, its economic expectancies, and damages as a result of Hart's breach of the CNSA and has been forced to incur, and will continue to incur, significant attorneys' fees to enforce the CNSA.

92.     As a result of Hart's breach of the CNSA, M3 has been damaged in an amount to be determined at trial.

93.     Unless restrained by this Court, the continuing wrongful actions of Hart, as detailed above, will continue to cause irreparable harm to M3 for which there is no adequate remedy at law.  M3 is therefore entitled to entry of preliminary and permanent injunctive relief prohibiting Hart from continuing to violate the NCSA.

### Count Five – Breach Of Contract – Proprietary Information and Inventions Agreement (Hart Only)

94.     M3 incorporates by reference paragraphs 1 through 93 above, as if fully set forth herein.

95.     Hart's PIIA is a valid contract that is binding upon Hart and is supported by mutual consideration.

96.     M3 performed all of its material obligations under the PIIA.

97.     Hart's PIIA's confidentiality provisions that she agreed that she would "hold in confidence and not disclose or, except within the scope of [her] employment with Company, use any Proprietary Information," Hart PIIA ¶ 2, was reasonable to achieve M3's legitimate business interests.

98.     Hart breached, is breaching, and threatening to continue to breach her PIIA by:

   (a)     directly competing with M3, providing the same services to M3's current clients on behalf of Atlas within the restricted time period;

   (b)     misappropriating and misusing M3's confidential, proprietary, and trade secret information; and

   (c)     misappropriating and misusing M3's confidential, proprietary, and trade secret information to compete with M3 during her employment with M3.

99.     As a direct and proximate result of the foregoing acts, M3 has suffered and continues to suffer harm to its competitive position, its economic expectancies, and damages as a result of Hart's breach of her PIIA and has been forced to incur, and will continue to incur, significant attorneys' fees to enforce Hart's PIIA.

100.    As a result of Hart's breach of the PIIA, M3 has been damaged in an amount to be determined at trial.

101.    Unless restrained by this Court, the continuing wrongful actions of Hart, as detailed above, will continue to cause irreparable harm to M3 for which there is no adequate remedy at

law.  M3 is therefore entitled to entry of preliminary and permanent injunctive relief prohibiting Hart from continuing to violate the PIIA.

### Count Six – Tortious Interference With M3's Contractual Relations
### With BluePrint (Hart and Atlas)

102.   M3 incorporates by reference paragraphs 1 through 101 above, as if fully set forth herein.

103.   M3 had a valid MSA with BluePrint, as amended and supported by mutual consideration.

104.   M3 had a longstanding business relationship with BluePrint and M3 and had a steady and increasing revenue stream with consistent sales from the BluePrint account from 2016 to 2019.

105.   Hart and DasGupta, as previous M3 employees and an officers and agent of Atlas, were aware of the valid contract between M3 and BluePrint and the longstanding relationship between M3 and BluePrint.

106.   Hart tortuously interfered with that relationship in breach of her fiduciary duty of loyalty as an employee of M3, and in violation of her restrictive covenants, by intentionally diverting BluePrint business away from M3 to Atlas.

107.   DasGupta, as an officer and agent of Atlas, intentionally interfered with M3's contract and longstanding business relationship with BluePrint by inducing Hart to breach her duty of loyalty to M3 by diverting BluePrint projects away from M3 to Atlas, and hiring Hart and Haunert away from M3 in violation of their restrictive covenants with the intention of poaching additional BluePrint business.

108.   M3 has lost significant sales, profits, and revenue in 2020 under the MSA as a result of Defendants' tortious conduct.

109.    Due to the longstanding relationship between BluePrint and M3, there was a reasonable probability that M3 would have received considerably more business from BluePrint in 2020 under the MSA absent the Defendants' tortious conduct.

110.    Therefore, M3 has suffered damages as a proximate result of Defendants' tortious inference with M3's contractual relationship.

111.    Defendant's tortious conduct was willful and malicious with the intent to harm M3's business.

112.    M3 is entitled to compensatory and punitive damages as a result of the Defendants' tortious conduct in an amount to be proven at trial.

### Count Seven – Tortious Interference With M3's Contractual Relations With Hart (Atlas Only)

113.    M3 incorporates by reference paragraphs 1 through 112 above, as if fully set forth herein.

114.    M3 had valid restrictive covenants with Hart in the form of the PIIA and NCSA, which were supported by mutual consideration.

115.    DasGupta, as an officer and agent of Atlas, was aware of these restrictive covenants when it hired Hart.

116.    Upon information and belief, Atlas' intentionally induced Hart to violate her obligations to M3 under the PIIA and NCSA.

117.    As a result of Atlas' tortious conduct, M3 lost a valuable, highly trained employee who managed valuable M3 clients, built key relationships with those clients, and who had access to M3's confidential and proprietary information and trade secrets.

118.    Therefore, M3 has suffered damages as a proximate result of Defendants' tortious inference with M3's contractual relationship with Hart.

119.    Atlas' conduct was willful and malicious with the intent of harming M3's business.

120.    M3 is entitled to compensatory and punitive damages as a result of the Defendants' tortious conduct in an amount to be proven at trial.

### Count Eight – Tortious Interference With M3's Contractual Relations with Haunert (Atlas Only)

121.    M3 incorporates by reference paragraphs 1 through 120 above, as if fully set forth herein.

122.    M3 hired Haunert as a Qualitative Project Manager on or around May 6, 2016, with a starting date of May 31, 2016.

123.    On May 6, 2016, Haunert signed an offer letter acknowledging that as a condition of M3's offer of employment she would be required to sign M3's Proprietary Information and Inventions Agreement, which included a non-competition and non-solicitation provision.

124.    On May 30, 2016, Haunert voluntarily executed the PIIA.

125.    The PIIA, executed between M3 and Haunert, contained a Non-Compete Covenant, which stated in relevant part:

> During [Haunert's] employment with the Company and for a period of *one year* (12 months) immediately following termination of [her] employment with the Company for whatever reason, Employee shall not . . . (ii) be employed by or serve as an employee for any competitor of the Company providing the same or similar product or services for any customer or client of the Company for whom the Employee provided such services pursuant to this Agreement.

Haunert PIIA ¶ 7 (emphasis in original).

126.    The PIIA between Hauntert and M3 is a valid contract that is binding upon Haunert and is supported by mutual consideration.

127.    DasGupta, as an officer and agent of Atlas, was aware of the PIIA between M3 and Haunert.

128.   DasGupta, as an officer and agent of Atlas and Virtue, intentionally interfered with the PIIA between M3 and Haunert by hiring Haunert away from M3 in violation of the non-competition clause of Haunert's PIIA.

129.   Haunert was actively working on projects with current M3 clients, such as BluePrint, while employed at Atlas and Virtue for the benefit of Atlas and Virtue and to the detriment of M3.

130.   M3 also suffered the loss of a valued, trained employee who had access to trade secrets and other confidential and proprietary business information in exchange for signing her PIIA.

131.   Therefore, M3 has suffered damages as a proximate result of Atlas' tortious inference with M3's contractual relationship with Haunert.

132.   Atlas' conduct was willful and malicious with the intent of harming M3's business.

133.   M3 is entitled to compensatory and punitive damages as a result of the Defendants' tortious conduct in an amount to be proven at trial.

## Count Nine - Common Law Unfair Competition (Hart and Atlas)

134.   M3 incorporates by reference paragraphs 1 through 133 above, as if fully set forth herein.

135.   Hart and Atlas gained an unfair competitive advantage over M3 by tortuously interfering with its contract with BluePrint.

136.   Hart gained an unfair advantage over M3 by breaching her fiduciary duty of loyalty to M3 by diverting business from M3 to Atlas prior to her resignation and misappropriating M3's trade secrets and confidential and proprietary information for the benefit of Atlas.

137.    Atlas gained an unfair competitive advantage over M3 by tortiously interfering with its restrictive covenants with Hart and Haunert.

138.    Atlas also gained an unfair competitive advantage by using M3's trade secrets and confidential and proprietary information to compete against it to win bids with M3's clients.

139.    As a result of Defendants' tortious conduct, M3 has lost a substantial competitive advantage and profits.

140.    Defendant's conduct was willful and malicious with the intent of harming M3's business.

141.    M3 is entitled to compensatory and punitive damages as a result of the Defendants' tortious conduct in an amount to be proven at trial.

**Count Ten - Civil Conspiracy (Hart and Atlas)**

142.    M3 incorporates by reference paragraphs 1 through 141 above, as if fully set forth herein.

143.    Upon information and belief, prior to Hart's resignation from M3, DasGupta, acting as an officer and agent of Atlas, discussed hiring Hart for a Senior Vice President role at Atlas.

144.    DasGupta was aware that Hart had been almost exclusively in control of the BluePrint account at M3.

145.    DasGupta, as a former executive of M3, knew or had constructive knowledge that Hart was subject to restrictive covenants that prohibited her from competing against M3, soliciting M3's clients, and diverting work away from M3 for one year after Hart's employment separation from M3.

146.    DasGupta was also aware that Hart was under certain obligations to maintain a duty of loyalty to M3 as a Vice President of Sales and not to divert business away from the company for the benefit of another company.

147.    Nevertheless, upon information and belief, Hart and DasGupta made an agreement to tortuously interfere with M3's contract and business relationship with BluePrint, to violate Hart's restrictive covenants with M3, to breach Hart's fiduciary duty of loyalty to M3, and to unfairly compete with M3 for M3's clients.

148.    In the months following DasGupta's resignation from M3, M3's sales, revenues, and profits from the BluePrint account dropped significantly.

149.    Hart's Market Research system activity logs in the Market Research system showed unusual and increased access to "partners," "client," and "clients" section of the site from February to May 2020, in the months immediately following DasGupta's departure from M3.  This activity was significantly increased from her previous access to these areas of the site and would have allowed her to obtain and transmit confidential and proprietary client information, including trade secrets, to herself or Atlas.

150.    Additionally, in May 2020, Atlas hired Haunert, who supported Hart's work on the BluePrint account at M3, in violation of Haunert's PIIA.

151.    Upon information and belief between February and June 2020, DasGupta and Hart discussed Hart leaving M3 for a position at Atlas.

152.    In June 2020, M3's BluePrint bid counts dropped significantly and Atlas began winning bids that M3 previously won.

153.    Prior to her resignation from M3, Hart admitted that she had already sold a substantial amount of work with Atlas.

154.    Shortly after, on July 30, 2020, Hart resigned her position with M3 to take the Senior Vice President role at Atlas, where she continues to sell market research work to BluePrint.

155.    As a proximate result of Defendants' tortious conduct M3 has lost and is continuing to lose substantial sales, revenue, and profits.

156.    Defendant's conduct was willful and malicious with the intent of harming M3's business.

157.    M3 is entitled to compensatory and punitive damages as a result of the Defendants' tortious conduct in an amount to be proven at trial.

### Count Eleven - Unjust Enrichment (Hart and Atlas)

158.    M3 incorporates by reference paragraphs 1 through 157 above, as if fully set forth herein.

159.    Hart and Atlas' wrongful use of M3's confidential information, as agents of Atlas, have given Atlas innumerable benefits without the time, effort, and expense of acquiring and developing the same.

160.    Upon information and belief, Hart and Atlas are still using M3's confidential information to the competitive disadvantage of M3.

161.    Defendants' conduct, as described herein, constitutes unfair competition, and has unjustly enriched Defendants at M3's expense.

162.    As a direct result of such conduct, M3 has suffered and will continue to suffer substantial damages and irreparable harm and loss.

163.    Atlas' profits as a result of its unlawful activities should be placed in a constructive trust.

23

**Count Twelve - Preliminary and Permanent Injunction (Hart and Atlas)**

164.   M3 incorporates by reference paragraphs 1 through 163 above, as if fully set forth herein.

165.   Defendants have engaged in breach of contract, breach of fiduciary duty, misappropriation of trade secrets, unfair competition, and other wrongful and tortious acts as alleged above.

166.   The continued misuse of M3's confidential and proprietary business information, unfair competition, and solicitation of M3's clients will cause irreparable harm to M3 for which there is no adequate remedy at law.

167.   Unless restrained, Defendants will continue to misuse M3's confidential and proprietary business information, unfairly compete with, and solicit M3's clients in violation of the agreements prohibiting such conduct.

168.   The irreparable harm that would be suffered by M3 if the injunction is not granted outweighs the harm to be suffered by Defendants if an injunction is granted.

169.   An injunction would not substantially injure any other interested parties.

170.   The public interest would be furthered by an injunction to enforce a valid contract between the Parties and protect confidential and proprietary information and trade secrets, which is necessary for free and fair competition.

171.   M3 is likely to prevail on the merits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants jointly and severally as follows:

1)   That Defendants be ordered preliminarily and permanently to return to M3 all confidential and proprietary information, including trade secrets, in their possession or control;

2)    That Defendants be preliminarily and permanently enjoined from using, transmitting, or disclosing any of M3's trade secret or confidential and proprietary information including, but not limited to, any and all M3 client information, pricing information, or bid information;

3)    That Defendants be ordered to disclose the names and addresses of any and all persons to whom they have disclosed M3's confidential and proprietary information, including, but not limited to, any and all of M3's client information;

4)    That Hart be enjoined from employment by Atlas or engage in any activity for a business in competition with the M3 and not assist any other person or organization in competing or in preparing to compete with a business providing healthcare market research in competition with M3 for a period of twelve (12) months from the date of this Court's order;

5)    That Hart be enjoined from contacting, calling upon, encouraging or soliciting, on behalf of a competitive business any existing or prospective client or customer of the M3, who she serviced, or otherwise developed a relationship with, as a result of her employment with M3 and refrain from diverting or attempting to divert or take away from the M3 the business or any such client or customer for a period of twelve (12) months from the date of the Court's order;

6)    That Defendants submit to expedited discovery, including forensic examination of their computers, cell phones and other electronic devices;

7)    That Defendants be ordered to disgorge any profits, monetary compensation or non-monetary compensation received as a result of the unlawful conduct set forth above;

8)    That M3 be awarded compensatory damages in an amount to be determined at trial;

        9)     That M3 be awarded punitive damages in an amount to be determined at trial;

        10)    That M3 be awarded exemplary damages in an amount to be determined at trial;

        11)    That M3 be awarded a reasonable royalty in an amount to be determined at trial;

        12)    That Atlas' profits as a result of its unlawful activities should be placed in a constructive trust.

        13)    That M3 be awarded prejudgment and post-judgment interest;

        14)    That M3 be awarded its reasonable attorneys' fees and costs;

        15)    That M3 be awarded such other and further necessary and proper relief as the Court may deem just and proper.

**[THE REMAINDER OF THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK.]**

Dated:  November 16, 2020

Respectfully submitted,


Jill Lashay, Esq.
Jared L. Pickell, Esq.
Buchanan Ingersoll & Rooney PC
409 North Second Street, Suite 500
Harrisburg, PA   17101
(717) 237-4971
jill.lashay@bipc.com
jared.pickell@bipc.com

Eric A. Welter, Esq. (*pro hac vice forthcoming*)
Brad W. Golstein, Esq. (*pro hac vice forthcoming*)
Welter Law Firm, P.C.
20130 Lakeview Center Plaza, Suite 400
Ashburn, VA 20147
(703) 435-8500
(703) 435-8851 (fax)
eaw@welterlaw.com

Attorneys for Plaintiff
M3 USA CORPORATION