**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **M3 USA CORPORATION** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  20-5736** |
| | : | |
| **KARIE HART,** *et al.* | : | |

## MEMORANDUM

**KEARNEY, J.**                                              **January 29, 2021**

Courts may only exercise jurisdiction over persons consistent with due process. Confirming the remote nature of many sales positions particularly during COVID-19 mitigation, we increasingly review theft of trade secret cases brought by Pennsylvania employers suing departed employees working from their non-Pennsylvania homes who join a competitor in yet another state after allegedly taking the Pennsylvania employer's trade secrets and confidential information.  The Pennsylvania employer alleges its former sales executive and her new employer – neither of whom reside in Pennsylvania – harm it in Pennsylvania by first taking and then using trade secrets to induce customers to hire the competitor.  We today first decide whether we may exercise personal jurisdiction over a sales executive working almost exclusively from her New Jersey home.  We must also decide whether we can also exercise personal jurisdiction over her new Georgia employer allegedly directing her to solicit her former clients by possibly breaching confidentiality covenants with her former Pennsylvania employer.  While we lack general personal jurisdiction over both the New Jersey sales executive and her current Georgia employer, we may exercise specific personal jurisdiction consistent with due process over the former employer's contract and tort claims against its former sales executive living in New Jersey. We may also exercise personal jurisdiction over all claims against the Georgia competitor now employing the New Jersey sales executive except for a claim of tortious

interference with contracts with former employees residing outside of Pennsylvania. The Pennsylvania employer also states contract and tort claims subject to further discovery.

## I.   Facts alleged and relevant to personal jurisdiction[1]

M3 USA Corporation, headquartered in this District and incorporated in Delaware, provides market research recruitment, data collection, and support services in the healthcare industry and to pharmaceutical companies in the United States, Europe, and Asia.[2] M3 contacts potential clients who in turn request "bids and quotes for specific projects."[3] M3 calculates its bids through the use of "confidential and proprietary formulas."[4] M3 considers its bid-calculating formulas, pricing information, and client information to be proprietary trade secrets.[5] M3 invests time and expenses into obtaining and developing this confidential and proprietary information, which it stores on password-protected networks, servers, and equipment.[6] M3 requires persons with access to this information to sign confidentiality and non-disclosure agreements.[7]

*Ms. Hart signs a Proprietary Agreement and a Confidentiality Agreement.*

M3 managed its business from its Washington, D.C. headquarters in 2009 when it first learned of Karie Hart.[8] Ms. Hart sought a position with M3 and identified her boyfriend's Philadelphia address on her resume even though she then lived in Delaware.[9] M3 extended her offer addressed to this Philadelphia address.[10] Ms. Hart moved to Shamong, New Jersey before accepting M3's offer and has lived there ever since.[11]

On May 29, 2009, M3 hired Karie Hart as an Inside Sales Manager to begin June 1, 2009.[12] Upon accepting her employment offer, Ms. Hart signed M3's Proprietary Information and Inventions Agreement ("Proprietary Agreement"), agreeing to "hold in confidence and not disclose or, except within the scope of [her] employment with company, use any Proprietary

information."[13]  The Proprietary Agreement did not have a forum selection clause but did have a New York choice of law provision.[14]  Ms. Hart also signed M3's Confidentiality and Non-Solicitation Agreement ("Confidentiality Agreement") as part of her 2010 Commission Plan.[15]

M3 agreed to pay Ms. Hart with commission from her sales and provide her access to industry information not generally known by the public.[16]  In exchange, M3 placed a series of restrictions on Ms. Hart designed to protect its confidential information.  For example, Ms. Hart agreed to "hold all of the Company's Trade Secrets and Proprietary Information in a fiduciary capacity for the benefit of the Company and to safeguard all such Trade Secrets and Proprietary Information" at all times during and after her employment with M3.[17]  Ms. Hart agreed she would not directly or indirectly disclose an M3 Trade Secret or Proprietary Information to an outside third party or entity unless the disclosure is in a good faith performance of her duties.[18]  She agreed she may not "contact, call upon, encourage or solicit on behalf of a competitive business . . . any existing or prospective client or customer of [M3], who [she] serviced, or otherwise developed a relationship with, as a result of [her] employment with [M3], nor will [she] attempt to divert or take away from [M3] the business or any such client or customer" while working for M3 and for one year after leaving M3 for any reason, defined as the Restricted Period.[19]

Ms. Hart agreed the Restricted Period would extend "for a period of time equal to the period of time during which [she] breached the agreement."[20]  She also agreed M3 would be entitled to "immediate relief," including "a decree for specific performance, a temporary or permanent injunction, equitable accounting of earnings, profits and other benefits arising from the violations."[21]  Ms. Hart agreed to provide new employers with a copy of the Confidentiality

Agreement.[22]  The parties identified a Washington, D.C. choice of law provision but no forum selection clause.[23]

### Ms. Hart's employment with M3.

Ms. Hart began working for M3 on June 1, 2009.[24]  M3 moved its principal place of business into this District (Fort Washington) in 2012.[25]  M3's Director of Human Resources swears, "[m]ajor company functions are performed at M3's Fort Washington headquarters such as: The Human Resources Department, the Corporate Department, the corporate Finance Department, the IT department, the Marketing Department, and Operations."[26]

Ms. Hart worked from her New Jersey home which is about fifty miles from M3's Fort Washington headquarters.[27]  Ms. Hart swears she would visit the Fort Washington office three to four times a year. [28]  She requested and received a key fob in 2020 to access the Fort Washington headquarters.[29]  Ms. Hart represented M3 with customers across the United States, including in California, Connecticut, Delaware, Washington, D.C., Florida, Georgia, Idaho, Illinois, Maryland, Minnesota, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, South Carolina, Utah, Texas, Virginia, and Wisconsin. [30]  She also serviced M3's international clients, including in India, Germany, France, the United Kingdom, Spain, Italy, Sweden, Norway, Finland, Denmark, and Japan.[31]  She works with M3 employees and supervisors in several different states and countries, including New York, New Jersey, Texas, North Carolina, and Pennsylvania.[32]  The parties dispute how frequently Ms. Hart interacted with her Pennsylvania supervisor Jim Anderson.[33]

M3 provided Ms. Hart with confidential and proprietary information during her tenure as Inside Sales Manager.[34]  M3 promoted Ms. Hart to the position of Senior Account Manager in March 2014.[35]  Within nine months, M3 again promoted Ms. Hart to a Senior Vice President of

Sales.[36]  In this senior role, Ms. Hart oversaw M3's BluePrint Research Group Account and served as the primary contact for BluePrint Research Group.[37]

On December 19, 2016, M3 and BluePrint Research Group entered into a Market Research Master Services Agreement (BluePrint Master Agreement), allowing M3 to provide healthcare market research services to BluePrint Research Group.  The BluePrint account produced a "steady and increasing revenue stream" between 2016 and 2019.[38]

*M3 senior employees resign from M3 to work with competitor in 2020.*

Atlas Primary, Inc. is a healthcare primary research company providing similar services as M3, occasionally to the same clients.[39]  Atlas is incorporated in Delaware and headquartered in Georgia.[40]

On January 1, 2020, M3's Chief Revenue Officer Indrani DasGupta resigned to become Atlas's Chief Executive Officer.[41]  Ms. DasGupta is a Texas resident.  Ms. DasGupta began "poaching M3's current employees and clients" shortly after she accepted this position despite knowing of M3's confidentiality and restrictive covenant agreements with employees.[42]

About six months later, M3 Project Manager Savanah Haunert from Oklahoma resigned from M3.  She worked on the BluePrint account.  She joined Ms. DasGupta at Atlas as Director of Market Research Operations.[43]

Sometime between February 2020 and June 2020, Ms. DasGupta recruited Ms. Hart from New Jersey to leave M3, join Atlas, and bring M3's BluePrint account with her.[44]  M3's activity logs on Ms. Hart's username in the M3 Market Research system reveal Ms. Hart's "unusual and increased" access to information between February 2020 and May 2020.[45]  Between April 2020 and July 2020, M3's BluePrint bids experienced a "substantial reduction" each month, and BluePrint bids became significantly lower when compared to BluePrint bids between April 2019

and July 2019.[46]  From 2019 to 2020, M3 calculated a 7.69% "win rate" reduction for BluePrint bids, forty-two less bid counts for BluePrint projects, and a drop in average quote count on BluePrint bids.[47]  M3 attributes part of its lost business to BluePrint choosingAtlas during this time.[48]

### Ms. Hart resigns from M3 on July 30, accesses its confidential information on July 31, and then begins working for competitor Atlas on August 3.

Ms. Hart resigned from M3 on July 30, 2020 with two weeks' notice. While she expected to continue working for the next two weeks, M3 terminated her employment on July 30.[49]  M3 reviewed Ms. Hart's activity leading up to her resignation and discovered the username associated with Ms. Hart "search[ed] pricing" documents on two of her last three days of working with M3 (July 28, 2020 and July 29, 2020).[50]  M3 flagged this activity as unusual and "not required in the regular course of her job duties at that time."[51]

Ms. Hart continued to access information related to M3 accounts after M3 terminated her.[52]  On Friday July 31, 2020 between 9:27 and 17:28, she accessed files from her laptop associated with M3's BluePrint account and Adelphi account, and accessed a folder titled "BluePrint" on the internal hard drive.[53]  M3 alleges a USB plugged into Ms. Hart's laptop during this time.[54]

On the next business day, Monday August 3, 2020, Ms. Hart began working for Atlas where her duties included working on Atlas's competing BluePrint account.[55]  She accessed M3's files between 16:09 and 16:14 from her M3 laptop associated with M3's BluePrint account and "created a subfolder called 'BluePrint – Copy.'"[56]

Late on her first day of working for Atlas, Ms. Hart returned her laptop and cell phone to M3's Pennsylvania headquarters, but she did not return a USB which M3 believes she used to download information about the BluePrint accounts.[57]  Atlas then contacted current M3

employees located in Pennsylvania regarding BluePrint projects once Ms. Hart came onboard.[58]
Ms. Hart works on accounts across the United States, including Pennsylvania accounts as an
Atlas employee.[59]

M3 sent a cease and desist letter to Ms. Hart and Atlas's senior officer Ms. DasGupta on
September 1, 2020, demanding Ms. Hart stop breaching her restrictive covenants and return
M3's confidential information and trade secrets.[60]

## II.    Analysis

M3 apparently thinks they did not stop.  It now sues Atlas and Ms. Hart for: (1) violating
the Defend Trade Secrets Act of 2016; (2) violating the Pennsylvania Uniform Trade Secret Act;
(3) tortious interference with contractual relations with BluePrint; (4) unfair competition;
(5) civil conspiracy; (6) unjust enrichment; and (7) a preliminary and permanent injunction.  M3
also sues Ms. Hart alone for (1) breach of the fiduciary duty of loyalty; (2) breach of the
Confidentiality Agreement; and, (3) breach of the Proprietary Agreement.  M3 sues Atlas alone
for: (1) tortious interference with contractual relations with Hart; and (2) tortious interference
with contractual relations with Haunert.

Ms. Hart and Atlas move to dismiss M3's Complaint for lack of personal jurisdiction.  In
the alternative, Ms. Hart and Atlas move to dismiss several of M3's claims on the merits for
failing to state a claim.  Atlas and Ms. Hart move to dismiss M3's: (1) claim against Ms. Hart for
breach of the Proprietary Agreement; (2) claim against Ms. Hart and Atlas for tortious
interference with M3's contractual relations with BluePrint; (3) claim against Atlas for tortious
interference with M3's contractual relations with Ms. Hart; (4) claim against Atlas and Ms. Hart
for unfair competition; (5) claim against Ms. Hart and Atlas for unjust enrichment; and (6) claim
for a preliminary and permanent injunction.

We may not exercise general personal jurisdiction over Ms. Hart or Atlas. But we may exercise specific personal jurisdiction over Ms. Hart consistent with due process on all claims against her.  We also may exercise specific general jurisdiction over Atlas for M3's claims of unfair competition, unjust enrichment, civil conspiracy, misappropriation, defense of trade secrets, and tortious interference with contractual relations with Blueprint.  But we may not exercise specific jurisdiction over Atlas for the tortious interference with contractual relations claim involving soliciting Ms. Hart from New Jersey and Ms. Haunert from Oklahoma.  Having determined we enjoy personal jurisdiction over Ms. Hart and Atlas for several of the claims asserted, we further find M3 has standing to assert a breach of the Proprietary Agreement and states a claim for tortious interference, unjust enrichment, and unfair competition.  The parties agree M3 erred in including separate count for a preliminary and permanent injunction, and we dismiss this claim without prejudice to seeking equitable relief through other claims.

### A. We may exercise specific personal jurisdiction over all claims against Ms. Hart and for all claims against Atlas except tortious interference with M3's contracts with Ms. Hart and Ms. Haunert.

We first decide whether we enjoy personal jurisdiction over Ms. Hart and Atlas. "Federal Rule of Civil Procedure 4(k) provides that personal jurisdiction in a United States District Court is established in accordance with the law of the state in which the District Court sits."[61] Pennsylvania's long-arm statute grants us jurisdiction "to the fullest extent allowed" under the United States Constitution.[62]   Under the Due Process Clause of the Constitution, we may exercise personal jurisdiction over those who have "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[63]

M3 bears the burden of "demonstrating facts that establish personal jurisdiction" when challenged.[64]  Our Court of Appeals directs "the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor" if a "court does not hold an evidentiary hearing on [a] motion to dismiss."[65]  When responding to a motion to dismiss for lack of personal jurisdiction, "the 'plaintiff must respond with actual proofs, not mere allegations.'"[66]  M3 can demonstrate we enjoy either general or specific jurisdiction.[67]  We first assess whether we may exercise general personal jurisdiction over Ms. Hart and Atlas.  We then assess whether we may exercise specific personal jurisdiction for the claims asserted.

### 1.    We may not exercise general personal jurisdiction over either Defendant.

We may not exercise general personal jurisdiction over Ms. Hart or Atlas.  For individual defendants, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile."[68]  For corporations, the Supreme Court instructs us to ask whether the continuous or systematic contacts "render [the corporation] essentially at home in the foreign [s]tate."[69]  Our Court of Appeals refers to a corporation's "place of incorporation and principal place of business" as where it is "at home."[70]  "[E]xceptional case[s]" may exist, where "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that [s]tate."[71]  When these rules for general jurisdiction do not apply, general jurisdiction may exist if a defendant consents to it.[72]

We may not exercise general personal jurisdiction over Ms. Hart.  M3 argues we may exercise general jurisdiction over Ms. Hart because she "has had systematic and continuous contact with the state of Pennsylvania up until the commencement of this suit."[73]  But this argument confuses the standard for exercising general personal jurisdiction over a corporation

with the standard for exercising general personal jurisdiction over an individual.[74]  "As an individual, [Ms. Hart] is subject to general personal jurisdiction only where [s]he is domiciled."[75] "The Supreme Court has never found an individual could be subject to general personal jurisdiction based on continuous and systematic contacts with a forum."[76]  M3 alleges "Hart is a citizen and domiciliary of New Jersey,"[77] and we have no basis to infer she consented to general personal jurisdiction in Pennsylvania.

Nor do we have general personal jurisdiction over Atlas.  It is difficult to "establish general jurisdiction in a forum other than the place of incorporation or principal place of business."[78]  For example, in *Kurz v. Holiday Hospital Franchising, LLC*, a plaintiff bringing a negligence claim against defendants' hotel franchise failed to establish general jurisdiction despite the franchise's several Pennsylvania hotel locations.[79]  The defendants' franchise incorporated in Delaware with a principal place of business in Georgia.[80]  Judge Quiñones found the franchise's "ownership and operation of numerous hotels in Pennsylvania" did not satisfy the "at home" general jurisdiction requirement; rather, it "establish[ed] [the hotel franchise] ha[d] a business presence in Pennsylvania."[81]  Lacking the "two paradigm bases" for general jurisdiction, Judge Quiñones granted the defendants' motion to dismiss.

In *Kearney v. Good Start Genetics, Inc.*, an employee suing his former employer under the Age Discrimination in Employment Act failed to establish general jurisdiction even though the employer "directed internet-based advertisements toward Pennsylvania by way of its website and ha[d] solicited business and made a number of sales in Pennsylvania."[82]  The former employer incorporated in Delaware and maintained its principal place of business in Massachusetts.[83]  In dismissing, Judge Quiñones noted the "narrowed . . . scope of general jurisdiction over corporate defendants" since the Supreme Court's decision in *Daimler AG v.*

*Bauman*.[84]   Judge Quiñones found the general jurisdiction argument using the employer's business engagements in Pennsylvania fell "far short" of establishing Pennsylvania as the business's "home."[85]

Atlas is not incorporated in Pennsylvania, nor is its principal place of business in Pennsylvania.   Atlas is incorporated in Delaware, and its principal place of business is in Georgia.   M3 argues Atlas's business activities and services within Pennsylvania evidence its "substantial and significant ties" in the forum.[86]   It argues Atlas's "servicing [of] clients in Pennsylvania," "business with [Pennsylvania] residents," and "advertising to and soliciting other clients and panel members in Pennsylvania" grant us general jurisdiction over Atlas.[87]   But we do not see Atlas's business operations in Pennsylvania as any more substantial than the defendant employer's operations in *Kearney* or *Kurz*.   Atlas does not specifically limit its services to Pennsylvania in any way to meet the "exceptional" standard for general jurisdiction. M3 offers no basis for us to plausibly infer Atlas consented to general jurisdiction in Pennsylvania.

### 2.   We may exercise specific jurisdiction over Ms. Hart for all claims.

We may exercise specific personal jurisdiction when: (1) "a non-resident defendant has 'purposefully directed' his activities at a resident of the forum";[88] (2) "the plaintiff's claims . . . 'arise out of or relate to' the defendant's activities";[89] and (3) "exercising personal jurisdiction [does] not 'offend traditional notions of fair play and substantial justice.'"[90]

Our Court of Appeals instructs "there are different considerations in analyzing jurisdiction over contract claims and over certain tort claims."[91]   The different standards apply when determining "[w]hether a plaintiff's claims 'arise out of or relate to' the defendant's contacts with the forum state."[92]   We separately analyze the tort and contract claims.   We first

assess whether we may exercise specific personal jurisdiction over the contract claims against Ms. Hart.  We then assess whether we may exercise specific personal jurisdiction over the tort claims against Ms. Hart.  Finally, we assess whether we have specific personal jurisdiction over the tort claims against Atlas.

> **a.    We may exercise specific jurisdiction over contract claims against Ms. Hart.**

We have specific personal jurisdiction over Ms. Hart for breach of the Proprietary Agreement and Confidentiality Agreement.  To establish specific jurisdiction over a contract claim, the plaintiff must first "[i]dentify[] some purposeful contact with the forum."[93]  The plaintiff must next establish the claim "arise[s] out of or relate[s] to" those contacts by showing "that the defendant's contacts with the forum were 'instrumental in either the formation of the contract or its breach.'"[94]  Finally, "the exercise of jurisdiction [must] otherwise 'comport with "fair play and substantial justice."'"[95]

> ***Ms. Hart made purposeful contact with Pennsylvania.***

Our Court of Appeals instructs us to consider "the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing" to determine whether we have specific jurisdiction over a breach of contract claim.[96]  Neither the "mere existence of a contract"[97] nor "infrequent or minimal communication" is sufficient to establish purposeful, minimal contacts.[98]

Judges in this District have reached different conclusions when analyzing whether employees working remotely for a Pennsylvania company in another state made "purposeful contact" with Pennsylvania simply by nature of their employment.  In *TorcUp, Inc. v. Aztec Bolting Services, Inc.*, Judge Kenney concluded a Pennsylvania employer failed to establish specific jurisdiction over a Texas sales representative who allegedly misappropriated the Texas

customer list and breached his sales contract when he limited his work responsibilities to Texas.[99]  The Pennsylvania employer hired the Texas employee "as a sales representative for its Houston, Texas region."[100]  The sales representative lived and worked remotely in Texas, did not conduct his business activities in Pennsylvania, and stole a list of Texas customers.[101]  Judge Kenney found "[r]emotely working for a Pennsylvania corporation, brief check-ins with managers . . . , and a four-day training in Pennsylvania" did not demonstrate the Texas sales representative "purposefully directed activities" to satisfy the first part of a specific jurisdiction analysis.[102]

By contrast, in *Numeric Analytics, LLC v. McCabe*, Judge McHugh held employees working remotely for a Pennsylvania company from Colorado, Ohio, Wisconsin, and Virginia made purposeful contacts with Pennsylvania through their employment even though several of them had never been to Pennsylvania "for any work-related purpose."[103]  Judge McHugh confirmed our standard, "in determining jurisdiction over a breach of contract claim, we must consider the totality of the circumstances, including . . . the parties' actual course of dealing."[104] In analyzing the totality of the circumstances, Judge McHugh considered several jurisdictionally relevant facts, including:(1) the company managed its personnel from Pennsylvania; (2) employees needed to contact the Pennsylvania office to resolve payroll, benefits, or other problems throughout the course of their employment; (3) medical coverage, medical benefits, and retirement plans were administered from Pennsylvania; (4) the employer managed timekeeping, each employee's billing of customers, and email from the Pennsylvania office; (5) the employer paid salaries using a Pennsylvania bank; and (6) the employees' contracts contained a Pennsylvania choice of law provision.[105]  He summarized, "[i]n short, all of the essential functions that allowed [the distant employees] to earn a living were channeled through

13

Pennsylvania . . . underscoring [the distant employees'] connection to the Commonwealth is more than incidental."[106]

In *Vizant Tech, LLC v. Whitchurch*, Judge Bartle exercised specific personal jurisdiction over a breach of contract claim brought by a Pennsylvania company against two former employees, both of whom resided in Georgia.[107]  Like Judge McHugh, Judge Bartle considered the "totality of the circumstances."[108]  He then explained, "[b]oth defendants signed the contract at issue, that is, the [employment] agreements, upon initiating their employment with [plaintiff]—a company with its principal place of business in Pennsylvania."[109]  He further explained the employees "continued to work for" the Pennsylvania company for more than a year and conceded they "travel[ed] to Pennsylvania on the Plaintiff's behalf while employed with [the company]."[110]  Taking these facts into consideration, Judge Bartle held, "[by] securing employment with . . . a Pennsylvania-based company, by entering into these [employment] agreements, and by maintaining certain professional responsibilities, including travel to Pennsylvania . . . , defendants reached out beyond one state and create[d] continuing relationships and obligations with citizens of another state."[111]  He further held, "[t]he defendant's employment, governed by the [employment] agreements amounted to a purposeful direction of their activities into Pennsylvania."[112]

The totality of circumstances surrounding Ms. Hart's and M3's employment relationship and governed by detailed contracts confirming her purposeful direction of activities into Pennsylvania.  Ms. Hart applied for this M3 job with a Philadelphia address on her resume.[113]  From the time M3 hired her in 2009, Ms. Hart worked remotely from her home in New Jersey.[114]  When she signed the contracts, M3 managed its business from Washington, D.C., and the contracts contain choice of law provisions identifying the law of Washington, D.C. and New

York as controlling.[115]  But since 2016, M3 has managed its business from Fort Washington, Pennsylvania in this District.  M3's Director of Human Resources Ms. Lamitna swears, without contest, "[m]ajor company functions are performed at M3's Fort Washington headquarters such as: The Human Resources Department, the Corporate Department, the corporate Finance Department, the IT department, the Marketing Department, and Operations."[116]  Ms. Hart visited the Fort Washington office three to four times a year.  Ms. Hart requested a key fob to access the Fort Washington office in 2020.  Ms. Hart had several supervisors, one of whom, Mr. Anderson, worked in Pennsylvania.  When Ms. Hart returned her laptop following her departure, she returned it to the Fort Washington office.  Ms. Hart primarily worked on the accounts for BluePrint, a New Jersey company, and Adelphi, a United Kingdom company, but she serviced accounts across the country and the globe.

Though a close call like Judge McHugh's analysis in *Numeric Analytics*, we find Ms. Hart directed purposeful contacts at Pennsylvania.  When seeking employment at M3, Ms. Hart marketed herself as a Pennsylvania resident.  Like the employees in *Vizant*, Ms. Hart "continued to work for" M3 for several years after it became headquartered in Pennsylvania, and she "maintain[ed] certain business responsibilities, including travel to Pennsylvania."[117]  She spent enough time in Pennsylvania to request a key fob to access its headquarters.  Unlike the facts presented to Judge Kenney in *TorcUp*, where the employer hired the Texas sales representative specifically to service Texas customers, Ms. Hart's business responsibilities had both national and international reach and included customers in Pennsylvania.  Like in *Numeric Analytics*, M3's corporate representative swears many of its back-office functions occur in Pennsylvania.  Ms. Hart used an M3-issued laptop and cellphone to work remotely.  She returned these devices to M3's Pennsylvania headquarters at the end of her employment.  There is no evidence she

could return them anywhere else.  The IT department servicing these devices operated out of the Pennsylvania office.  There is no evidence M3 managed its business from New Jersey or any other state.

### Ms. Hart's alleged breach related to her contacts with Pennsylvania.

Having determined Ms. Hart made purposeful contacts with Pennsylvania, we must assess whether these contacts "were 'instrumental in either the formation of the [Proprietary Agreement and the Confidentiality Agreement] or its breach.'"[118]   As Ms. Hart signed the Proprietary Agreement and the Confidentiality Agreement before M3 moved to Pennsylvania, we have no basis to infer Ms. Hart's contacts with Pennsylvania had a relation to their formation. We must then assess whether we can fairly characterize Ms. Hart's contacts with Pennsylvania as instrumental in the alleged breach of contract.

In both *Numeric Analytics* and *Vizant*, Judges McHugh and Bartle focused the analysis on whether the employee made purposeful contacts with Pennsylvania.  Having answered this question affirmatively, they summarily determined the breach of contact claim arose out of those contacts.  Judge Kenney in *TorcUp* took a different approach.  Although he determined the Texas-based employee did not have sufficient contacts with Pennsylvania, he nevertheless analyzed whether the alleged breach arose out of or related to the employee's contacts.  Judge Kenney held the employee's "contacts with Pennsylvania are not the contacts that give rise to this litigation; instead, it is the contacts with the customer list concerning Houston area customers that gives rise to this litigation."[119]   He reasoned, "[t]hose contacts primarily concern Texas, not Pennsylvania," and the employee's employment by "a Pennsylvania corporation does not affect whether he misappropriated a Houston, Texas based customer list."[120]

We face a much different alleged fact pattern than Judge Kenney's Texas-centric salesperson. Ms. Hart allegedly breached her contracts with M3 by misappropriating customer data and soliciting M3's customers. M3 alleges Ms. Hart "is currently breaching her non-solicitation obligations by working with Adephi," a foreign corporation with its United States operations based out of Pennsylvania.[121] She also allegedly misappropriated BluePrint's customer data by accessing files from her M3-issued laptop after she resigned, despite knowing M3 required her to return her laptop M3's Fort Washington headquarters. Ms. Hart, unlike the Texas salesperson in *TorcUp*, allegedly breached obligations in Pennsylvania. Her breach arose out of or related to her contacts with Pennsylvania.

### Exercising personal jurisdiction over Ms. Hart does not offend traditional notions of fair play and substantial justice.

Exercising personal jurisdiction over Ms. Hart comports with traditional notions of fair play and substantial justice. The Supreme Court instructs, "'the facts of each case must [always] be weighed' in determining whether personal jurisdiction would comport with 'fair play and substantial justice.'"[122] Factors to consider include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining the most efficient resolution of the controversies, and the shared interest of the several States in furthering fundamental substantive social policies."[123] "When jurisdiction is otherwise constitutional, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[124]

Judge McHugh considered these factors in *Numeric Analytics* and determined exercising personal jurisdiction over the remote employees of a Pennsylvania company to be fair. He reasoned, "Defendants knew they were working for a Pennsylvania company" and while he acknowledged the burden on the defendants in litigating in a forum across the country, he

explained "this burden weighs against Plaintiff's interest in litigating this case in a single forum."[125]  As the employer "would need to file the same Pennsylvania breach of contract claim in the jurisdiction where each Defendant resides," declining personal jurisdiction would impose a substantial burden on the employer.[126]  He further noted, "the very business activities in which Defendants were engaged were spread across different states and involved travel, including travel for annual meetings of Numeric Analytics."[127]  In Judge McHugh's view, "the nature of employment is highly relevant to the analysis of reasonableness."[128]  He reasoned, "[t]he benefits that flow from e-commerce, such as not having to relocate to accept a position, and the flexibility of work-from-home employment can be tempered with corresponding obligations to the employer."[129]

Like the remote employees in *Numeric Analytics*, Ms. Hart knew she worked remotely for a Pennsylvania company.  We agree with Judge McHugh the nature of her work as a remote employee is highly relevant to the analysis of reasonableness.  Ms. Hart enjoyed the benefits of remote work for a decade.  Her role involved travel, including to Pennsylvania, and she worked with employees and customers in Pennsylvania.  Unlike in *Numeric Analytics*, where many of the defendant-employees never set foot in Pennsylvania, Ms. Hart lives a mere fifty miles from the Fort Washington office and travels to the office quarterly.  The burden on Ms. Hart of defending herself in this District is far less than the burden on the employees in *Numeric Analytics*.  Ms. Hart also held herself out as a Pennsylvania resident when she first sought employment at M3.  We find it reasonable to exercise personal jurisdiction over Ms. Hart.

### b. We enjoy specific personal jurisdiction over the tort claims against Ms. Hart.

We also may exercise specific personal jurisdiction over Ms. Hart and Atlas for M3's Defense of Trade Secrets Act claim, Pennsylvania Trade Secret Act claim, breach of the duty of

loyalty claim, tortious interference claims, civil conspiracy, unfair competition, and unjust enrichment claims—all of which sound in tort.[130]  We need not conduct a separate jurisdictional analysis for each intentional tort when each tort is based on the same or similar allegations.[131]  Each intentional tort claim pled against Ms. Hart derives from the same general allegation: Ms. Hart absconded with M3's proprietary customer account data to deliver M3's clients to her new employer Atlas.

While the same three-part framework used to analyze specific jurisdiction for contract claims also applies to tort claims,[132] we ask different questions when determining whether a tort claim "arises out of or relates to" the defendant's contacts with forum.  For intentional torts, our Court of Appeals instructs us to apply the "effects test" described in *Calder v. Jones* to determine whether the claims "arise out of or relate to" the defendant's contacts.[133]  "[T]he *Calder* 'effects test' requires the plaintiff to show the following: (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity."[134]

We earlier determined Ms. Hart enjoyed sufficient minimum contacts with Pennsylvania and exercising personal jurisdiction over her would not offend traditional notions of fair play and substantial justice.  Our only remaining inquiry is whether M3's tort claims "arise out of or relate to" those contacts, which we assess using the *Calder* effects test.  Taking the facts alleged in the Complaint as true, Ms. Hart committed an intentional tort, satisfying the first prong of the *Calder* test.  We must analyze whether M3 felt the brunt of the harm in Pennsylvania and whether Ms. Hart "aimed [her] tortious conduct" at Pennsylvania.

M3 felt the brunt of the harm in Pennsylvania.  We recently applied the *Calder* effects test in *Devon v. DeMaio*.[135]  In *Devon*, a Pennsylvania medical-device company entered into a partnership with two representatives in Connecticut to market its products in New England.[136]  The Connecticut representatives then sought to form a competing entity in Connecticut which then poached the Pennsylvania company's New England clients.[137]  Although the alleged conduct took place in Connecticut and affected the Pennsylvania company's business opportunities in New England, we held the Pennsylvania company suffered the harm in Pennsylvania where it suffered the monetary harm.[138]

Ms. Hart aimed her alleged tortious conduct at Pennsylvania. As M3 suffered its monetary harm here in Pennsylvania, it "felt the brunt of the harm in Pennsylvania."[139]  Judges in this District have reached different conclusions when assessing whether remote employees who misappropriate their Pennsylvania-employer's trade secrets "aim" their alleged tortious conduct at Pennsylvania.  As Judge Bartle held in *Vizant*, "[t]o the extent that defendants came into the possession of information constituting trade secrets . . . they did so in the context of their employment."[140]  He reasoned, "[a]ny misappropriation of this material by defendants was 'purposefully directed' at Pennsylvania in that it was calculated to have a detrimental impact on a company located within that forum."[141]

In *TorcUp*, Judge Kenney determined he did not have personal jurisdiction over the trade secrets claim, finding "no facts demonstrating that [the defendants] aimed their alleged tortious conduct at Pennsylvania."[142]  Although the defendant-employee worked for and misappropriated the trade secrets of his Pennsylvania-based employer, the stolen trade secrets consisted of a Texas customer list.[143]  The Texas-based sales representative stole this list for the benefit of his new employer, a Texas corporation.[144]  Judge Kenney concluded, "[a]lthough the harm alleged

by Plaintiff was felt by the Plaintiff in Pennsylvania, the alleged conduct that led to the alleged harm was directed at Texas, not Pennsylvania."[145]

As in both *Vizant* and *TorcUp*, Ms. Hart allegedly misappropriated the trade secrets of a Pennsylvania company.  Unlike in *TorcUp*, where all the relevant conduct occurred in Texas, Ms. Hart directed her activities at multiple forums, not just her home state.  Ms. Hart, using devices issued to her by her Pennsylvania employer, accessed confidential files from her home in New Jersey.  The files she accessed involved a New Jersey based customer.  She allegedly misappropriated the files after Ms. Dasgupta, a Texas resident, recruited her to leave M3 and join Atlas, a Delaware corporation headquartered in Georgia.  She accessed BluePrint files on August 3, 2020, the same day she started working for Atlas and four days after she terminated her employment with M3.  She agreed to return her devices and her files to M3's Pennsylvania headquarters.

Ms. Hart directed her activities at Pennsylvania.  Rather than immediately returning her M3-issued devices to the Pennsylvania office as obligated, she used the devices to access confidential customer data after resigning.  Ms. Hart directed her activities at Pennsylvania by using these devices loaned by M3 to access her Pennsylvania employer's confidential trade secrets after resigning.  We may exercise personal jurisdiction over the intentional tort claims against her.

> ### 3.    We may exercise personal jurisdiction over M3's claims against Atlas except for the tortious interference with contracts with Ms. Hart and Ms. Haunert.

We now decide whether we may exercise specific personal jurisdiction over M3's intentional tort claims against Atlas.  Unlike the tort claims against Ms. Hart, which all stem from the same general allegation, the tort claims against Atlas derive from two subtly different

allegations: (1) Atlas induced Ms. Hart and Ms. Haunert to breach their contracts with M3 and join Atlas by breaching "restrictive covenants" in the Proprietary and Confidentiality Agreements; and (2) Atlas misappropriated and used M3's customer data to divert Blueprint business to M3.  We analyze whether we may exercise personal jurisdiction over the claims arising out of these two allegations.

### a.   We may exercise personal jurisdiction over the clams arising from Atlas's acquisition and use of M3's customer data to divert BluePrint business.

We may exercise specific personal jurisdiction over the claims Atlas wrongfully acquired M3's trade secrets and used them to interfere with M3's relationship with BluePrint.

We begin with the first prong of the traditional specific jurisdiction framework: determining if Atlas made some purposeful contact with Pennsylvania relative to this claim.  Our Court of Appeals directs "a deliberate targeting of the forum" is required for defendants to purposefully avail themselves in a forum.[146]  "[T]he 'unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient."[147]  Our Court of Appeals has found specific jurisdiction exists when a non-resident defendant "deliberately reache[s] into Pennsylvania to target . . . its citizens."[148]

Atlas purposefully availed itself of contacts with Pennsylvania.  Although a Delaware corporation headquartered in Georgia, Atlas has clients in Pennsylvania, including Ms. Hart's and M3's client, Adelphi.  M3 alleges Atlas's employees contacted "current M3 employees located in Pennsylvania regarding Blueprint projects."[149]  Atlas contacted Pennsylvania.

As discussed above, we apply the *Calder* effects test to determine whether M3's intentional tort claims against Atlas "arise out of or relate to" Atlas's activity in Pennsylvania. To do so, we determine whether M3 "felt the brunt of the harm caused by the tort" in

Pennsylvania and whether Atlas "expressly aimed" its alleged tortious conduct at Pennsylvania.[150]

M3 felt the brunt of the harm allegedly caused by Atlas in Pennsylvania. M3 suffered two forms of harm from Atlas's conduct: (1) the misappropriation of its trade secrets; and (2) the loss of revenue from its BluePrint account. To determine "where a corporation may hold its trade secrets, . . . [the corporation's residency] may be either the place of incorporation or the location of its principal place of business."[151] M3 felt the harm of loss of trade secrets in Pennsylvania and Delaware. It felt the monetary harm or its loss of revenue in Pennsylvania, where it is headquartered.

Atlas also expressly aimed this alleged tortious conduct involving alleged use of trade secrets to steal BluePoint projects in Pennsylvania. Our Court of Appeals instructs "[t]he defendant must 'manifest behavior intentionally targeted at and focused on' the forum for *Calder* to be satisfied."[152] M3 alleges Atlas employees contacted "current M3 employees located in Pennsylvania regarding Blueprint projects."[153] Taking this allegation as true, Atlas aimed its conduct at Pennsylvania by contacting M3 employees in Pennsylvania by seeking to extract confidential trade secrets of a Pennsylvania company.

We now determine whether exercising specific jurisdiction over Atlas "comport[s] with fair play and substantial justice."[154] We again consider "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies."[155] "The existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"[156]

Exercising specific jurisdiction over Atlas for this tortious interference claim does not offend traditional notions of fair play and substantial justice. Atlas has clients in Pennsylvania, and it sought proprietary information from Pennsylvania employees of a Pennsylvania company. "[M]odern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."[157] Pennsylvania has an interest in protecting the business headquartered under its laws. We may exercise specific personal jurisdiction over Atlas for the tort claims arising from Atlas's acquisition and use of M3's customer data to divert BluePrint business.

> **b.  We may not exercise specific personal jurisdiction over M3's claims Atlas interfered with its employment contracts with Ms. Hart and Ms. Haunert.**

Unlike our analysis on the tort claims involving interference with the BluePoint projects, we may not exercise specific personal jurisdiction over Atlas for tortious interference with M3's contracts with Ms. Hart from New Jersey and Ms. Haunert from Oklahoma. As discussed above, we find Atlas has purposefully availed itself of contact with Pennsylvania because it services clients in Pennsylvania and has reached out to employees working in M3's Pennsylvania office to obtain information about M3's customers. We must determine whether M3's claims "arise out of or relate" to Atlas's contact with Pennsylvania by applying the *Calder* effects test, which requires us to ask whether Atlas committed an intentional tort, whether M3 felt the brunt of the harm in Pennsylvania, and whether Atlas aimed its tortious conduct toward Pennsylvania.

Taking the allegations in the Complaint as true, Atlas committed several intentional torts. We further find M3 suffered the brunt of this harm in Pennsylvania. M3 alleges it suffered harm because it lost "valuable and trained employee[s]."[158] As many of M3 employees work remotely and service various clients across the country, it is difficult to trace where exactly M3 feels the harm of a lost employee. M3 will need to hire and train new employees, a burden inevitably

falling on the Human Resources department in Pennsylvania.  M3 will feel the harm in Pennsylvania if it suffers monetary harm due to Ms. Hart and Ms. Haunert's departures.

But we do not find Atlas aimed its tortious conduct at Pennsylvania.  Judge McHugh's reasoning in *Numeric Analytics* persuades us to apply the same analysis to M3's claim.  In *Numeric Analytics*, the employer alleged its former president "engaged in Tortious Interference by inducing the [employees] to violate their employment contracts with [their Pennsylvania employer]."[159]  At the time, the former president lived in Colorado and the employees he "poached" lived in Ohio, Wisconsin, and Virginia.[160]  Although Judge McHugh found he could exercise personal jurisdiction over the former president based on his status as a corporate officer and fiduciary of the Pennsylvania company, he called into doubt whether the former president's contacts with non-Pennsylvania residents, standing alone, would satisfy the *Calder* test.[161]  He explained, "[t]he conduct in question would have emanated from Colorado, where [the former president] is located, and reached into Ohio, Wisconsin, and Virginia where the other defendants reside."[162]  Judge McHugh found personal jurisdiction because, as a corporate officer, the former president's interference with the company's contracts "necessarily implicate[d] duties that separately exist by virtue of her fiduciary relationship with the entity."[163]

Ms. Hart lives and works for Atlas in New Jersey, and Ms. Haunert splits her time between Florida and Oklahoma.  Atlas is a Delaware corporation headquartered in Georgia.  Atlas reached out to Ms. Hart through Ms. DasGupta, who resides in Texas.  There is no evidence Atlas, through Ms. DasGupta or anyone else, traveled to Pennsylvania in recruiting Ms. Hart or Ms. Haunert.  Like in *Numeric Analytics*, Atlas's solicitation conduct neither emanated from nor reached into Pennsylvania.  But unlike the corporate fiduciary defendant in *Numeric*

*Analytics*, Atlas has no standalone duties to M3 or its employees justifying the exercise of personal jurisdiction over it in Pennsylvania.

We may not exercise personal jurisdiction over Atlas for its alleged tortious interference with M3's contracts with Ms. Hart and Ms. Haunert.

### B.    M3 stated claims within our jurisdiction except as to a separate claim for injunctive relief.

Having determined we enjoy personal jurisdiction over all claims except Atlas's tortious interference with contracts between M3, Ms. Hart, and Ms. Haunert, we now turn to Atlas and Ms. Hart's effort to dismiss some, but not all, of M3's claims for failure to state a claim.  Ms. Hart and Atlas move to dismiss M3's: (1) claim against Ms. Hart for breach of the Proprietary Agreement; (2) claim against Ms. Hart and Atlas for tortious interference with M3's contractual relations with BluePrint; (3) claim against Atlas for tortious interference with M3's contractual relations with Ms. Hart; (4) claim against Atlas and Ms. Hart for unfair competition; (5) claim against Ms. Hart and Atlas for unjust enrichment; (6) claim for a preliminary and permanent injunction.  We grant Ms. Hart's motion to dismiss the claim for a preliminary and permanent injunction, but we otherwise deny the motion. [164]

### 1.    M3 has standing to claim breach of the Proprietary Agreement.

M3 alleges Ms. Hart breached the Proprietary Agreement by misappropriating M3's confidential information.  Ms. Hart and Atlas move to dismiss, arguing M3 lacks standing to sue for the alleged breach of the Proprietary Agreement because M3 did not sign the Proprietary Agreement, So-Net M3 did.  Ms. Hart and Atlas argue M3 is a successor entity to So-Net M3 and may enforce only the contract provisions of the contract assignable to successors.

This argument is a red herring.  M3 is not a "successor" to So-Net M3.  M3 offers a sworn declaration So-Net M3 became M3 USA Corp. through simple corporate name change,

and Ms. Hart and Atlas offer no evidence to dispute M3's claim.[165]  "It is well-established that the change of a corporate name has no legal significance."[166]  To create a successor entity, M3 must dissolve So-Net Corporation and form a new corporation.[167]  There is no evidence of these necessary steps.  M3's corporate identity remained unchanged, and it may enforce contracts it entered into as So-Net M3.[168]

### 2.  M3 states a claim for tortious interference with M3's contractual relations with BluePrint.

M3 alleges Ms. Hart and Atlas tortiously interfered with its relationship with Blueprint by stealing M3's confidential and proprietary business information and using it to divert M3's business with Blueprint to Atlas.  Ms. Hart and Atlas argue we should dismiss M3's claim because M3 fails to allege BluePrint breached or terminated any contract with M3.  M3 responds arguing breach is not an element of tortious interference in Pennsylvania.  We agree with M3.

To state a claim for tortious interference with contractual relations, M3 must plead four elements: (1) a contractual or prospective contractual relationship between the plaintiff and third parties; (2) a purpose or intent to harm the plaintiff by interfering with the contractual relationship or preventing the contractual relationship from accruing; (3) the absence of a privilege or justification on the part of the defendant; and (4) the occurrence of actual harm or damage to the plaintiff as a result of defendant's conduct.[169]  M3 does not need to plead Blueprint breached any agreement with M3 to plead tortious interference.

Judges in this Circuit allow similar claims to proceed into discovery.  In *Liberty Mutual Insurance Company v. Gemma*, an employee served as the main contact person for his employer's client.[170]  As part of his employment, the employee had signed non-solicitation, non-compete, and confidentiality provisions.[171]  The employee later decided to leave his employer and join a competing entity.[172]  The employee took steps before leaving to steer his client away

from his former employer and toward its current employer.  He also forwarded himself client data.[173]  The former employer sued the employee and new employer for, among other things, tortious interference with contractual relations with its client.  The former employer did not allege the client breached any contract with it, but rather alleged the client "changed the way they interacted with" the former's employer's representative and stopped sending referrals to the former employer.[174]  Judge Kane found the plaintiff stated a claim for tortious interference with contractual relations against the employee and his new employer.

Like in *Liberty Mutual*, Ms. Hart and Atlas allegedly used Ms. Hart's position as a former employee and her access to confidential information to divert business opportunities from Atlas to M3.  M3 alleges this conduct led to BluePrint decreasing its business with M3.  As the reasoning in *Liberty Mutual* confirms, M3 does not need to allege BluePrint breached a contract with M3 to withstand a motion to dismiss.

### 3.   M3 states an unfair competition claim.

M3 alleges Ms. Hart and Atlas engaged in unfair competition by misappropriating its trade secrets to divert BluePrint's business to Atlas.  Ms. Hart and Atlas move to dismiss, arguing common law unfair competition in Pennsylvania is narrowly construed and applicable only to trademark infringement.  We disagree and deny Ms. Hart's and Atlas's motion to dismiss.

Several Pennsylvania courts recognize a cause of action for the common law tort of unfair competition.  These courts turn to Restatement (Third) of Unfair Competition Section 1 to define the elements of unfair competition.[175]  "Under the Restatement, a defendant is liable for unfair competition if: (1) he engages in deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, or acts or practices that are

actionable under federal or state statutes; and (2) his conduct causes harm to the plaintiff's commercial relations."[176]  In Pennsylvania, a cause of action for unfair competition is recognized "where there is evidence of, among other things . . . tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information."[177]

Ms. Hart and Atlas cite *Sandoz Inc. v. Lannett*[178] for the proposition unfair competition should not be used as a "catch-all business tort" and urges us to dismiss the unfair competition claim.  But *Sandoz*, in fact, counsels us to deny the motion to dismiss.  In *Sandoz*, a pharmaceutical company induced a manufacturer to breach its agreement with a competing pharmaceutical company and turn over the competitor's confidential and proprietary business information.  Denying the defendant's motion to dismiss the unfair competition claim, Judge McHugh declined "to adopt Plaintiff's sweeping assertion that a claim for tortious interference will always give rise to a claim for unfair competition."[179]  Judge McHugh nevertheless found "the nature of [the defendant's] alleged conduct, which includes inducement of a third party . . . to breach its agreement with [the plaintiff] and turn over confidential information, sufficiently resembles conduct prohibited as unfair competition by Pennsylvania courts."[180]  He reasoned, "[b]usinesses have been held liable for unfair competition in the employment context for soliciting employees with non-compete or solicitation agreements and inducing those employees to violate those agreements"[181] and cited several cases in illustration.

This case mirrors *Sandoz*.  Like in *Sandoz*, this case involves the misappropriation of confidential and proprietary business information.  We agree with Judge McHugh this conduct "sufficiently resembles conduct prohibited as unfair by Pennsylvania courts."[182]

#### 4.      M3 states an unjust enrichment claim.

M3 brings an unjust enrichment claim against Ms. Hart and Atlas, alleging Ms. Hart's and Atlas's use of M3's confidential information "constitutes unfair competition, and has unjustly enriched" Ms. Hart and Atlas at M3's expense.[183]  Atlas argues the unjust enrichment claim against Atlas must be dismissed because M3 cannot allege to confer a benefit on Atlas, as "there is no relationship between [M3] and [Atlas]."[184]  M3 argues under Pennsylvania law, it need not plead a direct relationship with M3 to sustain an unjust enrichment claim.  We agree with M3.

Under Pennsylvania law, "unjust enrichment claims . . . fall into one of two categories: (1) a quasi-contract theory of liability, where the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a 'companion' theory of liability, where the unjust enrichment claim is a companion to a tort claim and seeks to divest the defendant of a benefit obtained by committing the tort."[185]  Under the second theory, "the unjust enrichment seeks to recover a benefit the defendant gained by committing the tort."[186]  Therefore, "an unjust enrichment claim is essentially another way of stating a traditional tort claim,"[187] and "where the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim."[188]

To state a claim for unjust enrichment, M3 must plead: "(1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value."[189] In other words, a claim for unjust enrichment requires "a claimant . . . show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'"[190]

30

Whether unjust enrichment is appropriate "depends on the unique factual circumstances of each case."[191]  In *Lux Global Label Co., LLC v. Shacklett*, a label printing company brought an unjust enrichment claim against a competitor alleging an employee of the company shared confidential information with the competitor before and after the employee resigned from the company to join the competitor.   The confidential information includes financial records, projections, business strategies, customer lists, and pricing data.  Judge Jones noted "[t]here is no requirement that the benefits be directly conferred onto the defendant or that the acceptance be intentional."[192]  In finding the company conferred a benefit on the competitor, Judge Jones held "given that [the company] had to pay for much of the information [the competitor] was given . . . [the competitor] has improperly retained these benefits without payment."[193]

By contrast, in *Pellegrino v. Epic Games, Inc.*, Judge Padova dismissed a musician's unjust enrichment claim against a video game company.[194]  The musician alleged the video game company "misappropriate[d] [the musician's] likeness and the Signature [dance] Move" without the musician's consent.[195]   Judge Padova noted the musician does not allege he "directly conferred" a benefit on the video game company, but rather the video game company *took* the musician's signature dance move without consent.[196]  As a result, Judge Padova held "[t]here is, therefore, no basis for applying a quasi-contractual remedy [for unjust enrichment]."[197]

This case is far more like *Lux Global Co. LLC* than *Pellegrino*.   As in *Lux*, this case involves the alleged misappropriation of a former employer's trade secrets for the benefit of a new employer.   Moreover, Judge Padova in *Pellegrino* focused on the quasi-contractual theory of unjust enrichment.   M3 has plead unjust enrichment as a "companion tort" to its unfair competition and trade secrets claims.   As discussed, the unjust enrichment claims will "rise and fall" with these companion tort claims.

As Ms. Hart and Atlas have not presented sufficient grounds for us to dismiss the companion tort claims at this stage, we will not dismiss the unjust enrichment claims.

### 5. We dismiss the separate claim for preliminary and injunctive relief upon consent.

M3 seeks preliminary and injunctive relief against Ms. Hart and Atlas.  The problem is they seek this relief in a separate count.  Ms. Hart and Atlas move to dismiss arguing a preliminary and permanent injunction is a form of relief, not a cause of action.  M3 concedes this point.[198]  "It is well settled that 'injunctive relief is not a separate type of claim, but rather a form of relief, and as such, should not be designated as a separate count in the Complaint.'"[199]  We dismiss this separate claim without prejudice to M3 seeking injunctive relief if warranted based on its substantive claims.

## III.   Conclusion

We grant in part and deny in part the motion to dismiss for lack of personal jurisdiction over Ms. Hart and Atlas under Federal Rule of Civil Procedure 12(b)(2).  We grant the motion to dismiss Counts 8 and 9 against Atlas for lack of personal jurisdiction, but we otherwise deny the motion.  We also grant in part and deny in part the motion to dismiss under 12(b)(6).  We grant the motion to dismiss Count 12, but we otherwise deny the motion.

---

[1] Atlas and Ms. Hart move to dismiss under both Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6).  We need to evaluate adduced facts related to the defendants' potential minimum contacts with Pennsylvania consistent with the Due Process Clause and then, should we exercise personal jurisdiction, evaluate whether M3 pleads claims consistent with law.  "To determine jurisdictional questions, the Court must 'accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor.'"  *Cote v. U.S. Silica Co.*, No. 18-1440, 2018 WL 5718285, at *1 (M.D. Pa. Nov. 1, 2018) (quoting *Belden Techs., Inc. v. LS Corp.*, 626 F. Supp. 2d 448, 453 (D. Del. 2009)).  Once a defendant raises a personal jurisdiction defense, the plaintiff may support its burden to establish jurisdiction through sworn affidavits, testimony, or other qualified evidence.  *Id.*  The parties each attach documents and declarations to their memoranda of law, which we considered.

[2] ECF Doc. No. 1 ¶¶ 9, 10.

[3] *Id.* ¶¶ 12, 13.

[4] *Id.* ¶ 13.

[5] *Id.* ¶ 15.

[6] *Id.*

[7] *Id.*

[8] M3 maintained its principal place of business in Washington, D.C. until 2016.  ECF Doc. No. 16-1 at 3.

[9] ECF Doc. No. 17-1 at 1.

[10] ECF Doc. No. 16-1.

[11] ECF Doc. No. 17-1 at 1.

[12] ECF Doc. No. 1 ¶ 17.

[13] *Id.* ¶ 18.

[14] ECF Doc. No. 16-2 at 4.

[15] ECF Doc. No. 1 ¶ 19.

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 20.

[19] *Id.* ¶ 21.

[20] *Id.* ¶ 24.

[21] *Id.* ¶ 23.

[22] *Id.* ¶ 25.

[23] ECF Doc. No. 16-3 at 4.

[24] ECF Doc. No. 1 ¶ 18.

[25] *Id.*

[26] *Id.*

[27] ECF Doc. No. 16-1 at 4.

[28] ECF Doc. No. 17-1 at 2.

[29] *Id.*

[30] ECF Doc. No. 15-4 at 2.

[31] *Id.*

[32] *Id.*

[33] *Id.*; ECF Doc. No. 16-1 at 4.

[34] *Id.*

[35] *Id.* ¶ 28.

[36] *Id.*

[37] *Id.* ¶ 29.

[38] *Id.* ¶ 30.

[39] *Id.* ¶ 33.

[40] *Id.* ¶ 4.

[41] *Id.* ¶ 32.

[42] *Id.* ¶ 34, 35.

[43] *Id.* ¶ 36.

[44] *Id.* ¶ 37.

[45] *Id.* ¶ 38–41.

[46] *Id.* ¶ 39.

[47] *Id.* ¶ 40.

[48] *Id.* ¶ 41.

[49] *Id.* ¶ 42; ECF Doc. No. 17-1 at 3.

[50] ECF Doc. No. 1 ¶ 46.

---

[51] *Id.*

[52] *Id.* ¶ 47.

[53] *Id.*

[54] ECF Doc. No. 15-4 at 3.

[55] ECF Doc. No. 1 ¶ 43, 54.

[56] *Id.* ¶ 50.

[57] ECF Doc. No. 16-1 at 4.

[58] *Id.* at 5.

[59] ECF Doc. No. 15-4 at 3.

[60] ECF Doc. No. 1 ¶ 56.

[61] *Hughes Tech. Servs., LLC v. Glob. Consulting & Mech. Servs., LLC*, No. 20-3885, 2020 WL 7350994, at *3 (E.D. Pa. Dec. 15, 2020); *see also* Fed. R. Civ. P. 4(k)(1)(A).

[62] 42 Pa. Cons. Stat. § 5322(b); *see also Devon MD LLC v. DeMaio*, No. 19-5378, 2020 WL 1912108, at *6 (E.D. Pa. Apr. 20, 2020).

[63] *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

[64] *See Colvin v. Van Wormer Resorts, Inc.*, 417 Fed. App'x 183, 185–86 (3d Cir. 2011).

[65] *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

[66] *Hughes Tech. Servs.*, 2020 WL 7350994, at *3 (quoting *Hepp v. Facebook, Inc.*, No. 19-4034, 2020 WL 4437036, at *3 (E.D. Pa. Aug. 3, 2020)).

[67] *See Kyko Glob., Inc. v. Bhongir*, 807 F. App'x 148, 151 (3d Cir. 2020).

[68] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

[69] *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014) (quoting *Goodyear*, 564 U.S. at 919).

[70] *Malik v. Cabot Oil & Gas Corp.*, 710 F. App'x 561, 563 (3d Cir. 2017) (quoting *Daimler AG*, 571 U.S. at 137).

[71] *Kurz v. Holiday Hospitality Franchising, LLC*, No. 19-2129, 2019 WL 5068646, at *3 (E.D. Pa. Oct. 9, 2019) (quoting *Daimler AG*, 571 U.S. at 139 n.19).

---

[72] *Kraus v. Alcatel-Lucent*, 441 F. Supp. 3d 68, 73 (E.D. Pa. 2020).

[73] ECF Doc. No. 16 at 7.

[74] *Koch v. Pechota*, No. 16-3637, 2017 WL 43102, at *5 (D.N.J. Sept. 28, 2017) ("As an individual, [the defendant] is subject to general personal jurisdiction only where he is domiciled. The Supreme Court has never found an individual could be subject to general personal jurisdiction based on continuous and systematic contacts with a forum.").

[75] *Id.*

[76] *Id.*

[77] ECF Doc. No. 1 ¶ 3.

[78] *Alcatel-Lucent*, 441 F. Supp. 3d at 73 (quoting *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016)).

[79] *Kurz*, 2019 WL 5068646, at *3.

[80] *Id.* at *1.

[81] *Id.*

[82] *Kearney v. Good Start Genetics, Inc.*, No. 17-2363, 2017 WL 6206168, at *4 (E.D. Pa. Dec. 8, 2017).

[83] *Id.* at *1.

[84] *Id.* at *4.

[85] *Id.* at *5.

[86] ECF Doc. No. 16 at 8 (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 438 (3d Cir. 1987)).

[87] ECF Doc. No.16 at 8–9.

[88] *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

[89] *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020) (quoting *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007)).

[90] *Id.* (quoting *O'Connor*, 496 F.3d at 316).

[91] *Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir. 2001); *see also Miller Yacht Sales, Inc.* 384 F.3d at99.

[92] *Danziger & De Llano, LLP*, 948 F.3d at 130.

[93] *O'Connor*, 496 F.3d at 318.

[94] *Stursberg v. Morrison Sund, Pllc*, No.20-1635-KSM, 2020 WL 7319546, at *9 (E.D. Pa. Dec. 11, 2020) (quoting *Shafik v. Curran*, No. 1:09-cv-02469, 2010 WL 2510194, at *5 (M.D. Pa. June 17, 2020)).

[95] *Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 354 (E.D. Pa. 2016) (quoting *Burger King Corp.*, 471 U.S. at 476).

[96] *Remick*, 238 F.3d at 256.

[97] *Budget Blinds, Inc. v. White*, 536 F.3d 244, 261 (3d Cir. 2008) (citing *Burger King Corp.*, 471 U.S. at 472).

[98] *Goodway Grp. v. Sklerov*, No. 18-900, 2018 WL 3870132, at *5 (E.D. Pa. Aug. 15, 2018).

[99] See *TorcUP, Inc. v. Aztec Bolting Servs., Inc.*, 386 F. Supp. 3d 520, 523–24 (E.D. Pa. 2019).

[100] *Id.* at 523.

[101] *Id.* at 527.

[102] *Id.*

[103] *Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 355 (E.D. Pa. 2016).

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Vizant Tech, LLC v. Whitchurch*, 97 F. Supp. 3d 618, 638 (E.D. Pa. 2015).

[108] *Id.* at 630.

[109] *Id.* at 631.

[110] *Id.*

[111] *Id.* at 630.

[112] *Id.* at 631.

[113] ECF Doc. No. 17-1 at 1.

[114] *Id.*

[115] ECF Doc. No. 16-2 at 4; ECF Doc. No. 16-3 at 4.

[116] ECF Doc. No. 16-1 at 3.

[117] *Id.*

[118] *Stursberg*, 2020 WL 7319546, at *9 (quoting *Shafik*, 2010 WL 2510194, at *5).

[119] *TorcUp, Inc.*, 386 F. Supp. 3d at 527.

[120] *Id.* at 528.

[121] ECF Doc. No. 16 at 15.

[122] *Burger King Corp.*, 471 U.S. at 485–86 (quoting *Kulko v. Cal. Superior Court*, 436 U.S. 84, 92 (1978)).

[123] *Law Sch. Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 721 (E.D. Pa. 2015) (quoting *Burger King Corp.*, 471 U.S. at 477).

[124] *Numeric Analytics*, 161 F. Supp. 3d at 355–356.

[125] *Id.* at 356.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Vizant*, 97 F. Supp. 3d at 631–32 ("[I]f either defendant committed a violation of the DUTSA, then she has committed an intentional tort."); *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, No. 15-965, 2020 WL 1526940, at *11 (W.D. Pa. Mar. 31, 2020) ("[T]rade secret misappropriation claims sound in intentional tort."); *Remick v. Manfredy*, 238 F.3d 248, 260 (3d Cir. 2001) (analyzing tortious interference under the tort framework); *Certainteed Ceilings Corp. v. Aiken*, No. 14-3925, 2015 WL 410029, at *8 (E.D. Pa. Jan. 29, 2015) (characterizing breach of fiduciary duty as a tort claim); *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016) (explaining unjust enrichment can be a quasi-contract claim or a companion tort claim); *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995) (describing common law unfair competition as a tort).

[131] *See Remick*, 238 F.3d at 256 ("[T]he District Court did not conduct a claim-specific analysis except as to the breach of contract claim.  It may not be necessary to do so in every multiple claim case . . . .").

[132] *See Danziger & De Llano, LLP*, 948 F.3d at 129–30.

[133] *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007).  "Courts have reached different conclusions about whether the *Calder* test modifies or simply adds to the general test for specific jurisdiction."  *McCabe*, 161 F. Supp. 3d at 357 n.3.  In *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, our Court of Appeals recently instructed the "effects test" applies when determining "[w]hether a plaintiff's claims 'arise out of or relate to' the defendant's contacts within the forum state."  *Danziger & De Llano, LLP*, 948 F.3d at 130.

[134] *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998) (footnote omitted); *see also Danziger & De Llano, LLP*, 948 F.3d at 130.

[135] No. 19-5378, 2019 WL 7042426 (E.D. Pa. Dec. 19, 2019).

[136] *Id.* at *1.

[137] *Id.* at *2.

[138] *Id.* at *11.

[139] *Marten*, 499 F.3d at 297.

[140] *Vizant*, 97 F. Supp. 3d at 631.

[141] *Id.*

[142] *TorcUp, Inc.*, 368 F. Supp. 3d at 528.

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *O'Connor*, 496 F.3d at 317.

[147] *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

[148] *Id.* at 318.

[149] ECF Doc. No. 16 Ex. A ¶ 21.

[150] *Cabot Corp. v. Niotan, Inc.*, No. 08-1691, 2011 WL 4625269, at *13 (E.D. Pa. Sept. 30, 2011).

[151] *Id.* at *14.

[152] *Kiekart AG*, 155 F.3d at 265 (quoting *ESAB Grp. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)).

[153] ECF Doc. No. 16 Ex. A ¶ 21.

[154] *Law Sch. Admission Council, Inc.*, 153 F. Supp. 3d at 721 (alteration in original) (internal quotation marks omitted) (quoting *Miller Yacht Sales, Inc.*, 384 F.3d at 97).

[155] *Id.* (internal quotation marks omitted) (quoting *Burger King Corp.*, 471 U.S. at 477).

[156] *O'Connor*, 496 F.3d at 324 (quoting *Burger King Corp.*, 471 U.S. at 477).

[157] *Law Sch. Admission Council, Inc.*, 153 F. Supp. 3d at 721 (internal quotation marks omitted) (quoting *Deutz AG*, 270 F.3d at 150).

[158] ECF Doc. No. 1 ¶ 130.

[159] *Numeric Analytics*, 161 F. Supp. 3d at 358.

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] Federal Rule of Civil Procedure 12(b)(6) requires a complaint to state a claim upon which relief can be granted.  Fed. R. Civ. P. (12)(b)(6).  The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint.  *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019).  If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint.  *Id.* (internal quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Bos. MBS ARMT 2005-8*, No. 18-1718, 2020 WL 1514764, at *2 n.5 (3d Cir. Mar. 30, 2020) ("A motion to dismiss . . . 'may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility.'" (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011))).

"A claim has facial plausibility when the plaintiff pleads factual content . . . allow[ing] the court to draw the reasonable inference . . . the defendant is liable for the misconduct alleged."  *Robert W. Mauthe M.D., P.C. v. Spreemo, Inc.*, No. 19-1470, 2020 WL 1492987, at *2 (3d Cir. Mar. 25, 2020) (internal quotation marks omitted) (quoting *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017)).  While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility . . . a defendant has acted unlawfully."  *Riboldi v. Warren Cty. Dep't of Hum. Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (alteration in original) (internal quotation marks omitted) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient."   *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."   *Id.* at *1 (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)).   Our Court of Appeals instructs us to use a three-step analysis for 12(b)(6) claims.   First, we "must take note of the elements the plaintiff must plead to state a claim"; next, we "should identify allegations . . . not entitled to the assumption of truth" because they are no more than conclusions; last, "when there are well-pleaded factual allegations," we "should assume their veracity and . . . determine whether they plausibly give rise to an entitlement to relief."   *In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978, 2020 WL 2786936, at *4 (D.N.J. May 29, 2020) (second internal quotation marks omitted) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016)).

[165] ECF Doc. No. 16-1 at 3.

[166] *In re Lehman Bros. Inc.*, 574 B.R. 52, 59 (S.D.N.Y. 2017) (applying Delaware law).   We apply Delaware law to determine whether M3 is a "successor" entity because M3 has, since 2003, incorporated in Delaware.

[167] *Id.*

[168] *Harmon v. Ivy Walk Inc.*, 48 A.D.3d 344, 347 (N.Y. App. Div. 2008) ("[I]t has long been held that 'a corporation may be known by several names in the transaction of its business, and it may enforce and be bound by contracts entered in and adopted name other than the regular name under which it was incorporated.'" (quoting *Mail & Express Co., Inc. v. Parker Axles, Inc.*, 204 A.D. 327, 329 (N.Y. App. Div. 1923)))   We apply New York law in determining whether M3 may enforce the Proprietary Agreement in accordance with the Proprietary Agreement's forum selection clause.

[169] *Fluid Power, Inc. v. Vickers, Inc.*, No. CIV. A. 92-0302, 1993 WL 23854, at *4 (E.D. Pa. Jan. 28, 1993) (citing *Forum Publ'ns., Inc. v. P.T. Publishers, Inc.*, 700 F. Supp. 236, 244–45 (E.D.Pa.1988)); *Am. Trade Partners, L.P. v. A–1 Int'l Importing Enters., Ltd.*, 757 F.Supp. 545, 554–55 (E.D. Pa. 1991).

[170] *Liberty Mut. Ins. Co. v. Gemma*, 301 F. Supp. 3d 523, 528–29 (W.D. Pa. 2018).

[171] *Id.* at 528–530.

[172] *Id.* at 530.

[173] *Id.* at 531.

[174] *Id.* at 544, 544 n.17.

[175] *See* Restatement (Third) of Unfair Competition § 1 (Am Law Inst. 1995).

[176] *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 679 (E.D. Pa. 2018).

[177] *Id*. (quoting *Synthes (U.S.A.) v. Globus Med., Inc*., No. 04-cv-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005)).

[178] No. 20-3538, 2020 WL 7695960 (E.D. Pa. Dec. 28, 2020).

[179] *Id.* at *6–7.

[180] *Id.* at *7.

[181] *Id.*

[182] *Id.*

[183] ECF Doc. No. 1 ¶ 161.

[184] ECF Doc. No. 15-1 at 18.

[185] *Symphony FS Ltd. v. Thompson,* No. 5:18-CV-3904, 2018 WL 6715894, at *9 (E.D. Pa. Dec. 20, 2018).

[186] *Id.* at *10.

[187] *Id.* (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999)).

[188] *Whitaker v. Herr Foods, Inc*., 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016).

[189] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 277 (3d Cir. 2007) (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc*., 228 F.3d 429, 447 (3d Cir. 2000)).

[190] *Durst v. Milroy Gen. Contracting, Inc*., 52 A.3d 357, 360 (Pa. Super. Ct. 2012) (quoting *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985)).

[191] *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 569 (W.D. Pa. 2015) (quoting *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993)).

[192] *Lux Glob. Label Co., LLC v. Shacklett*, No. CV 18-5061, 2019 WL 3530424, at *8 (E.D. Pa. July 31, 2019) (citing *Baker v. Family Credit Counseling Corp*., 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006).

[193] *Id*. at *8.

[194] *Pellegrino v. Epic Games, Inc*., 451 F. Supp. 3d 373, 392 (E.D. Pa. 2020).

[195] *Id.* at 382 (first alteration in original) (internal quotation marks omitted).

[196] *Id.*

[197] *Id.* at 382 (second alteration in original) (quoting *Boring v. Google, Inc.*, 598 F. Supp. 2d 695, 703 (W.D. Pa. 2009), *aff'd in part, rev'd in part on other grounds*, 362 F. App'x 273 (3d Cir. 2010)).

[198] ECF Doc. No. 16 at 1.

[199] *Cook v. Gen. Nutrition Corp.*, No. 17-135, 2017 WL 4340664, at *8 (W.D. Pa. Sept. 29, 2017).